## THE SAMUEL F. HOUSEMAN.

(Circuit Court of Appeals, Third Circuit. May 10, 1901.)

No. 13.

SHIPPING—SINKING OF LIGHTER—LIABILITY OF OWNER.

Evidence *held* to show that the sinking of a barge, 14 hours after being loaded as a lighter, and while still lying alongside the ship with another large steamship close on the other side, was caused by her being crushed between the two during a storm, and was not due to her unseaworthy condition, so as to render her owner liable for the loss of the cargo.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

See 103 Fed. 663.

Henry R. Edmunds, for appellant.

Horace L. Cheyney, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from a decree of the district court for the Eastern district of Pennsylvania, in admiralty. The facts of the case, as established by what seems to us the preponderating weight of the testimony, are as follows: In the month of July, 1898, the steamship Scotia was in the port of Philadelphia, laden with a cargo of kainit, consigned to the appellee. This cargo was being discharged into lighters furnished to the appellee by the Philadelphia Lighterage Company, to be transported by it to the Tygert-Allen Company's works at Greenwich, on the Delaware river. Mr. Roth, a clerk of the appellee, who had the hiring of the barges, called at the office of the lighterage company to procure another barge, in order to finish the lightering of the cargo. Mr. Brown, the superintendent of the lighterage company, informed Roth that they did not have a barge; whereupon Roth, who had been specially instructed by the appellee not to do any business with Hagan, the appellant, requested Brown to get one from Hagan, whose place of business was but a few doors below that of the lighterage company. Brown went into Hagan's, hired the barge Samuel E. Houseman, and on his return informed Roth that he could get this barge, but would not be responsible for it, and that he would have to take the risk himself; to which Roth says, "I concluded to take the barge at our risk." The instructions from the appellee to its agent, Roth, not to do business with the appellant, and the conversation between the agent and the superintendent of the lighterage company, as well as the purpose for which the boat was to be used, were not made known to the appellant. The hiring was for an indefinite time, at five dollars per day, which included a man on board to keep her pumped out, but who had nothing to do with the loading, discharging, or moving of the boat. The hire money was paid to the appellant by the lighterage company. On the 2d day of July, 1898, the lighterage company's tug came to the appellant's shipyard, and took charge of the Houseman, which had been recently repaired, and was in good seaworthy condition, and took her to pier 43, Dela-

ware river, where she was placed alongside the ocean steamship Scotia, which was lying in the same dock with the ocean steamship Florida, at pier No. 44. So that the barge was lying between the two steamships, and so close together were they that the captain of the barge could reach over his boat, and touch the Florida. They commenced to load the Houseman about noon of Saturday, July 3d, and finished about 11:30 p. m. the same night. No attempt was made to remove the boat from this dangerous position between the two steamers, but it was permitted by appellee to remain there for a day after being loaded. Nothing more than the ordinary pumping of the boat in summer time was required, and she remained in good seaworthy condition, with a man in charge, until about 3 p. m. of July 4th, when a storm arose, with wind blowing at the rate of 41 miles an hour. This had the effect of drawing the steamers together in the dock, squeezing the barge, tearing and breaking her planks, and causing her to make water so fast that, notwithstanding the efforts of two men on board, it was impossible to keep her afloat by pumping, and she sank in the dock, between the two steamers, shortly after 10 o'clock p. m. In August, 1899, more than a year thereafter, a libel in personam was filed by the appellee against Peter Hagan, the owner of the barge, for the loss of the cargo of kainit, alleging the unseaworthiness of the barge as the cause thereof. A decree was entered by the court below against Peter Hagan, the owner and respondent, for the sum of $1,268.16, from which decree this appeal was taken.

The questions raised by this appeal are, in the main, questions of fact, and the assignments of error, 10 in number, are, with one exception, to findings of fact by the court below. In our reading of the testimony, we are compelled to take a different view of the evidence from that taken by the court below, as is indicated by the statement, just made, of facts that we think the weight of the testimony establishes. Much of the testimony was conflicting and unsatisfactory, but we think the court below erred in giving undue weight to that on the part of the appellees, and in holding that their contentions had been maintained.

In regard to the crucial question of fact, as to what caused the sinking of the barge of the appellant, whether hired directly from him or from the lighterage company, it seems to us that the testimony of the appellant, and the circumstances tending to corroborate it, were lost sight of by the court below, and that the conclusion that she sank from the unseaworthy condition existing at the time of hiring was reached on insufficient evidence, resting, as it did, largely on the inconsistent testimony of the man in charge of the barge in regard to the necessity of pumping prior to the storm of the afternoon of July 4th. The testimony, however, shows that the barge had been recently overhauled and repaired just prior to the hiring, having only been used for lightering three cargoes; that she was in fair condition on the 3d of July, when she was loaded from the Scotia by the appellee; that if any pumping was done after she was loaded, and prior to the storm on July 4th, it is not at all clear from the testimony that it was other than the pumping usually

necessary in a loaded barge, and consistent with a seaworthy condition.

On the other hand, we think an adequate and efficient cause of the sinking was shown by the testimony in regard to the storm which occurred on the afternoon of July 4th. We think the clear weight of testimony is that the barge was squeezed by the two steamships on either side of her, in the narrow space that she occupied between them. The condition of the barge, as to her planking above and below water, disclosed when she was raised, was such as must have resulted from some such pressure as would be caused by the movement of the two steamships towards each other consequent upon the storm. The testimony as to this condition is not controverted. It includes, not only that of the man in charge, but of the ship carpenter, who inspected the barge just after she was raised and hauled out for repairs. The planks above and below the water line were broken in, and her lines were pressed out of shape. These breaks were new breaks, as testified to, and could not possibly have existed prior to the storm. The storm was more than an ordinarily severe one, and shown by the official reports of the weather bureau to have been characterized by a wind blowing at the rate of 42 miles an hour. The only testimony relied upon to controvert this conclusion is, as we have said, that of the man in charge of the barge, in regard to pumping on the morning of the 4th of July, and whose inconsistent testimony is undoubtedly open to criticism. But he testifies distinctly that the two steamships "pulled away from their wharves during the squall," and "did squeeze the barge so hard that there were two planks broken just over the pump at the butts, and then her bilges were squeezed in and crooked, and also some of the planks," and that he was "on the barge, in the cabin, at the time." John Lynch, also, who testifies that he "came on board during the storm, to help the captain," says that "the two steamers were touching her," and that the "wind caused the steamers to pull against her," and were "smashing her." After a careful reading of the testimony on this point, we think that the sinking of the barge is reasonably accounted for by the testimony which connected it with the storm, and the consequent pressing together of the two large steamships, between which she was lying, and in which dangerous place the appellee had allowed her to lie for 14 hours after she had been loaded.

Although, in this view of the case, it may not be necessary to discuss the testimony as to the other points raised by the assignments of error, we are of opinion that the testimony supports the contention that the barge was hired to the Philadelphia Lighterage Company, and not to the appellee, and that, therefore, the present action, being in personam against the appellant, must fail. For the reasons stated, the decree of the court below must be reversed, and a decree entered dismissing the libel.