SUSAN DURHAM SPENCE v. JAMES ROBERT DURHAM AND WIFE, FAYE MUNDY DURHAM, RONALD KENNETH SPENCE, RICHARD T. SPENCE AND WIFE, FRANCES HAWKINS SPENCE

No. 18

(Filed 31 August 1973)

1. Constitutional Law § 26— foreign judgment — full faith and credit

A judgment of a court of one state must be given the same effect in any other state which it has by law or usage in the courts of the state 'where it was rendered.

2. Constitutional Law § 26; Divorce and Alimony § 22— foreign custody decree — full faith and credit — modification for changed circumstances

The courts of this State will accord full faith and credit to the custody decree of a sister state which had jurisdiction of the parties and the cause as long as the circumstances attending its rendition remain unchanged; however, when a child whose custody is in dispute comes into this State our courts have jurisdiction to determine whether or not conditions and circumstances have so changed since the entry of the custody decree that the child's best interests will be served by a change of custody. G.S. 50-13.5(c)(2)a; G.S. 50-13.7(b).

3. Divorce and Alimony § 22— Georgia custody decree — modification for changed circumstances

Since a Georgia court could alter its own child custody decree upon a showing of a change in circumstances adversely affecting the child, a North Carolina court may also modify it upon the same ground.

4. Divorce and Alimony § 22— modification of foreign custody decree — necessity for evidence of conditions when decree entered

Since a Georgia child custody decree contained no findings of fact, it was necessary for a North Carolina court to hear evidence with reference to conditions existing at the time the Georgia decree was entered before the court could determine whether changed circumstances justified its modification.

5. Divorce and Alimony § 24— modification of foreign custody decree — emotional stability — sufficiency of evidence and findings

In a mother's action to modify a Georgia decree which granted custody of minor children to their maternal and paternal grandparents on the basis that both the mother and father were emotionally disturbed and unstable and that their conduct had been such that neither was then a suitable person to have custody of the children, the trial court's award of custody to the mother was supported by findings supported by competent evidence that (1) the mother is now emotionally stable; (2) she is successfully established in her profession as a speech therapist in a North Carolina community and has an income sufficient to support herself and her children in desirable surroundings; (3) her professional reputation and general character are good; (4) for the five months preceding the hearing plaintiff supported and

cared for the children in a home she provided for them in a good neighborhood; (5) the mother is attending to their schooling, religious education, and social life and is able to be with the children when they are not in school; and (6) she is now a fit and proper person to have custody of the children and is better able to respond to their daily needs than the grandparents.

**6. Divorce and Alimony § 22— child custody proceeding — continuing jurisdiction of court**

Jurisdiction of a court in a child custody proceeding continues as long as a minor child whose custody is the subject of a decree remains within its jurisdiction; upon motion of a party or upon its own motion, after due notice, the court may conduct a hearing to determine whether the decree should be modified.

**7. Divorce and Alimony § 24— modification of foreign custody decree — order that trial court review conditions periodically**

In view of the evidence in this case which dictated a Georgia decree awarding custody of minor children to their grandparents because the parents were both then unfit to have custody, the Supreme Court, in the exercise of its supervisory powers, directs the district court in this State which modified the Georgia decree by awarding custody to the mother to ascertain periodically whether conditions have developed which adversely affect the children's welfare.

Justice HIGGINS concurring.

Justice LAKE dissenting.

ON plaintiff's petition for certiorari to review the decision of the Court of Appeals reversing the judgment in her favor entered by *Clifford, District Court Judge,* 13 December 1971 Session of the District Court of FORSYTH.

Action under G.S. 50-13.7(b) (1971 Supp.) for custody of minor children.

*Hudson, Petree, Stockton, Stockton & Robinson and White & Crumpler for Susan Durham Spence, plaintiff appellant.*

*Womble, Carlyle, Sandridge & Rice for Mr. and Mrs. James Robert Durham (parents of plaintiff).*

*Hatfield, Allman and Hall by Roy G. Hall, Jr., James W. Armentrout and Wetson P. Hatfield for Ronald Kenneth Spence, Richard T. Spence, and Frances Hawkins Spence, defendant appellees.*

SHARP, Justice.

Plaintiff, Susan Durham Spence, born 11 June 1935, instituted this action on 24 May 1971 to obtain the custody of her two minor daughters, Fay Frances Spence, born 15 June 1962, and Dianna Jeannene Spence, born 5 June 1964. The defendants are Ronald Kenneth Spence, the children's father (Spence); James Robert Durham and wife, Faye M. Durham, the parents of plaintiff (maternal grandparents or Durhams); and Richard T. Spence and wife, Frances H. Spence, the parents of Ronald K. Spence (paternal grandparents). All parties are properly before the court and participated in the proceeding in which the judgment *sub judice* was rendered.

Plaintiff and her parents are residents of Winston-Salem, Forsyth County, North Carolina. Spence is a resident of the State of Kansas; the paternal grandparents reside in the State of Georgia. The children have been physically present in this State since September 1970.

The following events, stated chronologically insofar as possible, disclose a portion of the background of this controversy:

Plaintiff and Spence met in 1959 at the University of Georgia, from which each obtained a bachelor's degree. Thereafter, on 9 September 1960, they were married in Winston-Salem, North Carolina. In 1961 both enrolled as graduate students at the University of Virginia. There Spence pursued courses in advanced chemistry, and plaintiff studied speech pathology. Spence, who became "disinterested in chemistry," dropped out of school in late 1961 and obtained employment with the Sperry Piedmont Company as an engineering analyst. Plaintiff continued her studies under a scholarship. She obtained the degree of Master of Education in Speech Pathology and Audiology shortly before the birth of her first child, Fay.

In April 1963, after Spence had worked for eighteen months with the Sperry Company, he and plaintiff moved to California. There, for about two years, he was employed by "Lockheed Missiles and Space Company in the field of computers" at Sunnydale. During this period plaintiff's second child was born, and she worked part of the time in a hospital at Mountain View, where the family lived. In May 1965 Spence left Lockheed to work for Univac, a division of Sperry Rand Corporation, in San Diego. In the fall of 1966, with the idea that they might work together, both plaintiff and Spence enrolled in the Uni-

versity of California at San Diego for studies in linguistics. To further his studies Spence gave up his job with Univac in December 1966 and obtained employment at the University of California. Plaintiff worked at the speech and hearing center there from August 1965 until late August 1967, when she left California to teach at the University of Richmond in Virginia.

Plaintiff's move to Richmond was for professional and financial reasons. Her sojourn there was not intended as a separation from Spence, who visited her a number of times in Richmond. At different times between August and December, Spence and the respective grandparents cared for the children. In early December, Spence withdrew from the University of California and went to the home of his parents in Georgia. At that time he delivered the children to plaintiff in Richmond, and they remained with her there until the completion of her contract in June 1968.

From 15 January 1968 until March 1970, when he was "laid off in a mass reduction in force," Spence worked for Lockheed at Smyrna, Georgia. In June 1968 plaintiff and the two children joined Spence in Smyrna, where they shared his one-bedroom "bachelor's apartment," and plaintiff started a private practice in speech therapy. In July 1968 an 18-year-old girl, Linda Preyer, who had kept house for them in San Diego, came to live with plaintiff and Spence in the bachelor's apartment. In the fall plaintiff and the children moved into an adjoining apartment.

On 9 January 1969 Spence brought an action for divorce against plaintiff in the Superior Court of Cobb County, Georgia. On that morning he informed plaintiff that he would vacate his apartment during the day. Plaintiff took the children to school as usual and, at 3:00 p.m., she went for them. She left them in the playroom of her speech and language school, where they were to remain while she saw her last pupil of the day. That task completed she returned to the playroom to find the children gone. It was "days later" before she learned that Spence had taken the children to the home of their paternal grandparents about sixty miles away. Upon inquiry the paternal grandmother had denied that the children were there and that she had any knowledge of their whereabouts.

Plaintiff was not permitted to see the children until after 3 February 1969, when the Georgia court issued a temporary order giving Spence's parents custody of the children *pendente*

*lite.* That order denied both Spence and plaintiff any access whatever to the children except that each was allowed one two-hour visitation each week in the home of the paternal grandparents.

On 6 February 1969 the maternal grandparents petitioned the court to allow them to intervene in the pending divorce action and were allowed to do so. They prayed that, if the court should conclude neither plaintiff nor Spence was a suitable custodian, the custody of the two children be awarded to them. The paternal grandparents were also permitted to intervene. Thus, the parties to the Georgia proceeding and to this one are the same.

On 2 June 1969, the day the case was scheduled for trial, all parties were present in court and represented by counsel. Plaintiff did not contest Spence's action for divorce, and he obtained an absolute divorce on the grounds of mental cruelty.

On the issue of custody the court heard no evidence. That controversy was determined by a consent judgment, which was signed by the judge and by counsel for all parties. In pertinent part this judgment is summarized below:

1. The court awarded custody of the two children to the paternal grandparents during the months of June, July, and August of each year and to the maternal grandparents during the months of September through May. Plaintiff and Spence were given the right to visit the children in the home of their respective parents without restriction. Each was, however, enjoined from removing the children from the grandparents' homes, and the grandparents were under positive orders to prevent the children's removal. During the school months, when the Durhams had custody, the paternal grandparents had the right to have the children visit in their home during all school holidays. The judgment provided for alternative divisions of custody between the grandparents in the event of the death of one or more grandparents, the final award being to the last surviving grandparent.

2. Both Spence and plaintiff were relieved of all obligation to support their children. Neither maternal nor paternal grandparents were to look to either of them for reimbursement of any sums expended for the maintenance and education of the children. The grandparents having custody were to pay the children's expenses during the time they had them. The Dur-

hams were to send the children to private schools in Winston-Salem, and the grandparents receiving the children at the end of each custody period were to pay the cost of transporting them to their home.

3. Both maternal and paternal grandparents canceled all debts which either plaintiff or Spence owed them.

4. The maternal grandparents were required to give a bond in the sum of $10,000.00 conditioned upon their compliance with the consent judgment and any future orders of the court. The clerk of the Superior Court of Cobb County was appointed process agent for the Durhams in any proceedings regarding the custody of the children and any breach of the terms of the bond.

As directed by the judgment, on 20 June 1969, the Durhams executed and delivered to the Sheriff of Cobb County a compliance bond in the sum of $10,000.00.

Spence testified that within two weeks after he instituted divorce proceedings against plaintiff, on 20 January 1969, he was in touch with Dr. Arlene Gregory, whom he had met in 1955 when she was a premedical student. He had courted her unsuccessfully just before he married plaintiff, "perhaps on the rebound." In July 1969 Spence and Dr. Gregory were married. At that time she had just finished her graduate residency in anesthesiology.

In late August 1969 the Spence children went to the home of the Durhams in Winston-Salem. Except for school holidays, which they spent with the paternal grandparents, the children remained with the Durhams until June 1970 when they returned to Georgia as required by the consent judgment.

In the summer of 1969 plaintiff left Smyrna and went to Rome, Georgia, to become the director of the Northwest Georgia Speech and Hearing Center, a fourteen-county governmental speech pathology and hearing clinic for children and adults. In September 1970 she moved to Winston-Salem to become head of the department of speech pathology at the Medicenter of America's facility there.

In September 1970 the Spence children returned to the home of the Durhams in Winston-Salem for the school year 1970-71.

Spence v. Durham

On 24 May 1971, without the knowledge of her parents, plaintiff brought this action to obtain the custody of her children. On 25 May 1971 she secured from the District Court of Forsyth County an order restraining the removal of the children from Forsyth County pending that court's determination of their custody. In that order the hearing on this question was set for 3 June 1971. Mrs. Durham testified that but for the injunction prohibiting her from doing so she would have returned the children to Georgia as she had previously done. Upon receiving the court's order she immediately informed the paternal grandparents of it and returned the travel tickets they had sent the children.

On 3 June 1971 the paternal grandparents and Spence petitioned the Cobb Superior Court to attach the maternal grandparents for contempt and to forfeit their $10,000.00 bond. In that proceeding the Durhams pled, *inter alia*, the order of the North Carolina court restraining the removal of the children from the State. On 23 August 1971 the Cobb Superior Court held Mr. and Mrs. Durham in contempt, fined them $200.00 each, and forfeited their bond. These orders were affirmed by the Supreme Court of Georgia. *See Durham v. Spence*, 228 Ga. 525, 186 S.E. 2d 723 (1972). Thereafter, on 30 March 1972 the Superior Court of Cobb County ordered the proceeds of the bond paid to the paternal grandparents.

The hearing of the controversy *sub judice*, originally set for 3 June 1971, was continued at Spence's request and rescheduled for July 20th. On that day Spence again requested a continuance, and the cause was continued indefinitely to a date to be set by the court upon motion of any party to the action. At the same time, however, the court signed an order giving plaintiff temporary custody of the children, and the Durhams surrendered the children to her on 20 July 1971. Since that date they have resided with plaintiff.

At the hearing, which was begun on 29 December 1971, all parties offered evidence with reference to the circumstances and conditions which preceded the separation between plaintiff and Spence. This evidence fully explained the consent judgment of 2 June 1969, which divested both plaintiff and Spence of the custody of their children.

Plaintiff and Spence, neither of whom had testified in the Georgia proceeding, both testified at the hearing before

Judge Clifford, and both were extensively cross-examined. The testimony of each with reference to the conduct of the other, and their admissions with reference to their own conduct, disclosed improper behavior on the part of both so extraordinary as to seem incredible. Plaintiff and Spence each denied portions of the other's testimony. However, the admissions of each, together with the corroborative evidence of other witnesses, suffice to establish the existence of a situation in their home *in Smyrna during the five months from August through December 1968,* which was beyond the pale of the most permissive society. To perpetuate this evidence in our reports would not only be a disservice to "two little girls [who] are very exceptional children," but would perhaps put a stumbling block in the way of their mother's continued restoration. For this reason we omit any discussion of it.

It may be that a conceivable explanation of the conduct of plaintiff and Spence is to be found in the fact that in January 1969 both were in such a state that they were consulting psychiatrists. Spence testified that at the time the consent judgment was entered he was unable to care for his children "in terms of residence" and that "the emotional and psychological turmoil during the previous year" had left him "equally unqualified." At the "strong instance" of his father he was seeing a psychiatrist. Plaintiff testified that, at the same time, she too was consulting a psychiatrist.

Spence's explanation of his behavior was that he "was very much subordinated by Susan's personalty"; that she had "a much stronger personality than his in terms of will and ability to persuade." He told the court that he "was acting in response to being dominated by [his] wife," who "was controlling [his] actions to a certain extent," and that "many actions were fully dominated by her." Spence also testified that during the periods in which plaintiff "was not emotionally distressed she was a good mother . . . very concerned for her children's welfare." In his opinion she was disqualified as a custodian only because she was not sufficiently stable over a sufficiently long period of time to guarantee the children "a consistent environment."

Spence's father testified that, in his opinion, in January 1969 neither his son nor plaintiff was a fit person to have control of the children and, for that reason, he had intervened in the custody proceeding; that he thought his son was "showing tremendous improvement" in December 1971, but he still

believed himself to be a better custodian than Spence. However, when pressed on cross-examination, he said "Actually there are no defects in Ronnie now"; he is "now a fit and proper person to have custody of the two daughters." Implicit in the testimony of Mr. Spence was the opinion that plaintiff remained unfit to have the children's custody. Plaintiff's mother testified that, in her opinion, plaintiff was the fit and proper person to have the custody and Spence was not; that she had never believed the charges Spence made against her daughter.

In April 1971 Spence went to work as supervisor of programming in the data processing department of the Retail Credit Company in Atlanta, Georgia. He resigned this position in November 1971 to move with his wife to Parsons, Kansas. He testified that she felt she should go to Parsons to care for her invalid twin sister. At accessible schools in Kansas, Spence said he hoped to continue his education and to obtain a PhD degree in the field of linguistics. At the time of the hearing in Forsyth County both he and his wife were unemployed and living off the accounts receivable from her former practice. These, Spence thought, would be sufficient to support him, his wife, their 18-months-old baby, and his two daughters (should he be awarded their custody) until his wife could re-establish a practice and until he could get a PhD and secure a teaching position. In the meantime Spence had no income from any source whatever. However, unless he gets custody himself he does not "want to pay one penny of support for the girls."

Plaintiff testified that she is now a clinical speech pathologist, certified by the American Speech and Hearing Association; that she continues as head of the speech pathology department at the Medicenter's Winston-Salem facility, where she gives therapy to all types of inpatients with speech afflictions; that she also conducts an outpatient clinic in which she gives speech therapy to both children and adults in the entire Forsyth County area and sees patients from Greensboro, Salisbury, High Point, Statesville, and Lexington; that forty-five percent of the patients are children. Spence testified that plaintiff "was a very talented teacher." She has had dramatic successes with many children.

At the time of the hearing plaintiff was residing with the two children "in a very nice two-bedroom, pool-side apartment" on Country Club Road directly across the street from the children's school and the Trinity Methodist Church of which

she is an active member. She sings in the choir and participates in all church functions. The children regularly attend Sunday School, sing in the children's choir, and take part in all the youth activities. They are Girl Scouts and do superior work in school. Each morning plaintiff "walks them across the street to school" before she goes to work and returns to pick them up at 3:00 p.m.

In July 1971 plaintiff consulted Dr. David Allen Hill, a clinical psychologist on the faculty of Wake Forest University. He had not previously known her. She informed him of the accusations which had been made against her and which would be made again with reference to her fitness as a custodian of her children and requested him to test and examine her fully. Dr. Hill testified that he warned her that his tests might reflect unfavorably upon her and she replied that "if the test suggested something wrong with her, she'd rather know it." After administering a series of eight tests, Dr. Hill concluded that plaintiff was, "in the ordinary sense of the word, a normal individual," showing "normal female interests in work and hobby and relating to people," and that she enjoyed working with children. He found no evidence of a personality pattern consistent with sexual deviancy, prolonged promiscuity, or peculiar behavior. In his opinion she was not lying; that she attempted to present herself in "as positive and as honest a light as she could."

Dr. Richard C. Proctor, head of the department of psychiatry at the Bowman-Gray School of Medicine testified that in March 1971 he examined plaintiff and, in his opinion, she would be a competent and capable mother, able to assume the responsibility of rearing her children in a satisfactory manner; that one could have had a disorder in 1968 which was not present in 1971; and that he could find no indication of abnormal tendencies in her.

Plaintiff also offered evidence that her character and reputation in the community were good. The minister of Trinity Church, the Reverend Mr. George Bumgarner, testified that since June 1970 he had known plaintiff and observed her with her children; that they had a happy normal relationship and the children seemed well adjusted.

Spence testified that, "pursuant to this case," during 1971 he had employed and paid detectives to observe plaintiff, find

out what her circumstances were, and to discover whether she was engaged in any abnormal conduct. These detectives were not tendered as witnesses and did not testify.

The hearing before Judge Clifford lasted for four days. At its conclusion he found facts, the pertinent portions of which, except when quoted, are summarized below:

1. Since 20 July 1971, when plaintiff was awarded temporary custody of the two children, they "have at all times been well, fully, and adequately cared for."

2. Plaintiff is a well educated and intelligent woman who, since moving to Winston-Salem in 1969, has established a successful and growing speech therapy clinic for children and adults. She has rented and furnished an apartment "in one of the better sections of Winston-Salem which is adequate in all respects as a home for herself, Fay and Dianne. Susan Durham Spence is respected in this community by professional people with whom she deals and is a person of high character and reputation. She is an active member of Trinity Methodist Church. . . . She is a person exceptionally well qualified by training and experience to rear children and is in all respects a fit and proper person to have the custody of her two minor children who are subject to this action."

3. Since the two children first came to Winston-Salem in 1969 to live with the Durhams during the school months they "have established excellent associations and records in school." Their best interests require that they live continuously in "their primary environment," and that their custody be awarded to their mother, the plaintiff.

4. Both the maternal and paternal grandparents are fit persons to have custody of the children, but all four grandparents "are of such age that the best interest of the two children will be served by awarding primary custody to their mother."

5. The judge of the Superior Court of Cobb County, Georgia, signed the judgment of 2 June 1969 without having heard any evidence, and he made no findings of fact in support of the court's award of custody to the grandparents.

6. The contention of the defendants Spence, stated in open court, is "that at the time of the entry of the Cobb County judgment Susan Durham Spence was not a fit and proper person to have custody of Fay and Dianne."

Spence v. Durham

7. Irrespective of justification for the Cobb County judgment "there have been substantial changes in the conditions since 2 June 1969 which dictate that the said order be altered." Among these changes are the following:

a. Plaintiff, Susan Durham Spence, is now a fit and proper person to have the custody of her children.

b. On 2 June 1969 plaintiff was highly emotional in consequence of the abduction of her children on 9 January 1969 and deprivation thereafter of the right to see them alone. Today she is "a well-adjusted, emotionally stable individual, fully capable of caring for and rearing Fay and Dianne."

c. The two girls are now older and at an age when they have greater need of a mother's care and attention. The grandparents are not as able to respond to the children's needs as they were in 1969, and the burden and expense of their care and support should no longer be imposed upon them.

d. Spence has become the father of an illegitimate child. He has remarried and fathered a legitimate child, moved with his wife and *their* child to Kansas. He is unemployed and living on the accounts receivable of his present wife, who is also unemployed.

e. Plaintiff has an established profession and home and has made a place for herself in the community where she is able to care for herself and her children adequately. Her routine and schedule is such that she can be with them the greater part of the time they are not in school.

Upon the foregoing findings of fact the court concluded:

(1) The courts of this State are not bound by the Georgia judgment entered in Cobb County on 2 June 1969; and

(2) In the event the Georgia judgment is entitled to full faith and credit, the conditions surrounding the parties have changed so substantially that the best interests of the children require the judgment be altered by awarding their custody to their mother. Whereupon the court awarded the exclusive care, custody, and control of the children to plaintiff, granting Spence and the paternal grandparents the right to visit the children in North Carolina at reasonable intervals.

From this judgment Spence and the paternal grandparents appealed to the Court of Appeals. That court held (1) that

Judge Clifford erred in his ruling that the Georgia judgment was not entitled to full faith and credit, but (2) that he had correctly concluded the courts of this State have jurisdiction to enter orders providing for the custody of minor children physically present in this State and, upon a showing of changed conditions, to modify any order for custody made by the court of another state. G.S. 50-13.5(c) (2)a (1971 Supp.) and G.S. 50-13.7(b). The Court of Appeals then disposed of the case as follows: "It suffices to say that the evidence does not support the findings of fact and that the findings of fact do not support the judgment. The judgment of the Superior Court of Cobb County, Georgia, remains in full force and effect. The judgment and orders of the District Court of Forsyth County purporting to modify the same are reversed." *See Spence v. Durham,* 16 N.C. App. 372, 191 S.E. 2d 908 (1972).

Plaintiff petitioned this Court for certiorari, and we allowed the petition.

[1] The general rule is that, under the full faith and credit clause of the United States Constitution (art. IV, § 1), a judgment of a court of one state must be given the same effect in any other state which it has by law or usage in the courts of the state where it was rendered. *Ford v. Ford,* 371 U.S. 187, 9 L.Ed. 2d 240, 83 S.Ct. 273 (1962); 47 Am. Jur. 2d *Judgments* §§ 1219, 1226 (1969). "The Supreme Court of the United States, however, has not yet declared in positive terms that the provisions of a foreign divorce decree relating to custody are entitled to full faith and credit where the divorce court had jurisdiction in personam of both spouses or of both parties and the child." 24 Am. Jur. 2d *Divorce and Separation* § 998, at 1136 (1966). *See generally Ford v. Ford, supra; Kovacs v. Brewer,* 356 U.S. 604, 2 L.Ed. 2d 1008, 78 S.Ct. 963 (1958); *May v. Anderson,* 345 U.S. 528, 97 L.Ed. 1221, 73 S.Ct. 840 (1953); *Halvey v. Halvey,* 330 U.S. 610, 91 L.Ed. 1133, 57 S.Ct. 903 (1947).

[2] It is widely held by state courts, however, "that child custody awards by courts of sister states are entitled to full faith and credit." Annot., 35 A.L.R. 3d 520, 538 (1971). Our own decisions establish that the courts of this State will accord full faith and credit to the custody decree of a sister state which had jurisdiction of the parties and the cause as long as the circumstances attending its rendition remain unchanged. However, when a child whose custody is in dispute comes into

this State our courts have jurisdiction to determine whether or not conditions and circumstances have so changed since the entry of the custody decree that the child's best interests will be served by a change of custody. G.S. 50-13.5(c)(2)a; G.S. 50-13.7(b). *See In re Marlow,* 268 N.C. 197, 150 S.E. 2d 204 (1966); *In re Craigo,* 266 N.C. 92, 145 S.E. 2d 376 (1965); *Cleeland v. Cleeland,* 249 N.C. 16, 105 S.E. 2d 114 (1958); *Richter v. Harmon,* 243 N.C. 373, 90 S.E. 2d 744 (1956).

In both Georgia and North Carolina a decree awarding the custody of minor children determines only the *present* rights of the parties under the conditions then existing; it is not permanent in its nature and is subject to judicial alteration or modification upon any change of circumstances substantially affecting the welfare of the children. *Shepherd v. Shepherd,* 273 N.C. 71, 159 S.E. 2d 357 (1968); *Wilson v. Wilson,* 269 N.C. 676, 153 S.E. 2d 349 (1967); *Thomas v. Thomas,* 259 N.C. 461, 130 S.E. 2d 871 (1963); *Hardee v. Mitchell,* 230 N.C. 40, 51 S.E. 2d 884 (1949); *Holmes v. Holmes,* 211 Ga. 827, 89 S.E. 2d 194 (1955); *Fortson v. Fortson,* 195 Ga. 750, 25 S.E. 2d 518 (1943). The rule is that the welfare of the child whose custody is in controversy is "the polar star by which the courts must be guided in awarding custody."

**[3]** The Supreme Court of the United States has specifically held that where the court of one state is empowered to alter its own custody decree upon a showing of a change in circumstances affecting the question, the courts of another state may also modify it upon the same grounds. *Ford v. Ford, supra; Kovacs v. Brewer, supra; Halvey v. Halvey, supra.* Since the Georgia court could alter its decree upon a showing of a change in circumstances adversely affecting the children no question of the right of the North Carolina court to do so can arise.

We do not deem it necessary to consider the question (discussed in the briefs) whether a consent judgment fixing custody, rendered by the court of a sister state which failed to conduct adversary proceedings and inquire into the circumstances affecting the child, is entitled to full faith and credit. *See* Annot., 35 A.L.R. 3d 520, 560 (1971); 24 Am. Jur. 2d *Divorce and Separation* § 819 (1966).

Certainly it is the court's duty to award custody in accordance with the best interests of the child, and no agreement, consent or condition between the parents can interfere with this

Spence v. Durham

duty or bind the court. *In re Burton*, 257 N.C. 534, 126 S.E. 2d 581 (1962) ; *Thomas v. Thomas*, 248 N.C. 269, 103 S.E. 2d 371 (1958) ; 3 Strong, N. C. Index 2d, *Divorce and Alimony* §§ 22, 24 (1967). However, an agreement between the parties with reference to custody which is accepted by the court and incorporated in its decrees, is "none the less a judgment of the court, having the usual attribute[s] of conclusiveness." *Fortson v. Fortson*, 195 Ga. 750, 754, 25 S.E. 2d 518, 522 (1943). *See also Bunn v. Bunn*, 262 N.C. 67, 136 S.E. 2d 240 (1964).

[4] We do not assume that the Superior Court of Cobb County, Georgia, entered its judgment in this case "casually, pursuant to an agreement of the parties and without a true, judicial consideration of the facts." 24 Am. Jur. 2d *Divorce and Separation* § 819 (1966). On the contrary, we assume the judge was apprised of the evidence the parties were prepared to offer and agreed with them that the custody decree which he signed was, at that time, in the best interests of the children and their parents. Since the decree contained no findings of fact—purposely omitted, we are certain—it was necessary for the Forsyth District Court to hear evidence with reference to conditions existing at the time the Georgia decree was entered before it could evaluate the controversy and determine whether changed circumstances justified its modification. 24 Am. Jur. 2d *Divorce and Separation* § 819 (1966). *See also* Annot., 35 A.L.R. 3d 520, 560 (1971).

Spence and the paternal grandparents, appellees in this court, concede that the District Court of Forsyth had authority to change the Georgia custody decree upon a showing of changed circumstances. However, they contend, "(1) The plaintiff failed to show a change of circumstances because she did not offer any proof of what the circumstances were at the time the Georgia order was entered. . . . (2) The facts cited as justification for her having custody are irrelevant, insubstantial, and feathery. . . ." Since the greater part of the tesimony covering 359 pages of the record was aimed at establishing the situation which existed at the time the Georgia decree was entered, there is no merit in appellees' first contention. We proceed on the assumption that the Georgia court was of the opinion that both Spence and plaintiff were emotionally disturbed and unstable, *and their conduct had been such that neither was then a suitable person to have custody of the children.* We can think of no other reason for the judgment the court entered.

The crucial question presented by this appeal is whether the Court of Appeals erred in holding that the record contains no evidence sufficient to support Judge Clifford's finding that plaintiff is now a fit and proper person to have the custody of her children and, in their best interest, custody should now be awarded to her. If the facts which the trial judge found are supported by competent evidence they are binding on the appellate division. *Teague v. Teague,* 272 N.C. 134, 157 S.E. 2d 649 (1967); *Hinkle v. Hinkle,* 266 N.C. 189, 146 S.E. 2d 73 (1966); *Griffin v. Griffin,* 237 N.C. 404, 75 S.E. 2d 133 (1953).

[5]   We hold that competent evidence supports Judge Clifford's findings that (1) plaintiff is now emotionally stable; (2) she is successfully established in her profession in Forsyth County and surrounding areas and has an income sufficient to support herself and her children in desirable surroundings; (3) her professional reputation and her general character are good; (4) for the five months preceding the hearing plaintiff supported and cared for the children in a home she had provided for them in a good neighborhood; (5) plaintiff is attending to their schooling, religious education, and social life and has arranged her affairs so that she is able to be with the children when they are not in school; (6) she is now a fit and proper person to have the care and custody of her children, better able to respond to their daily needs than the grandparents, and that the children's best interests require that their custody be awarded to her. Certainly these findings are sufficient to support the district court's judgment.

Nothing in this record leads us to believe that the children's best interest requires their custody to be awarded to Spence. Indeed, we are left with the impression that Spence himself is not seriously seeking the custody of his children; that his efforts are in behalf of his parents. Unemployed and living off his present wife's accounts receivable, he has started a new family and he is also under obligation to another child. Although prior to their separation the conduct of both plaintiff and Spence was inexplicable and not to be condoned, plaintiff's ability to complete an undertaking and her record of accomplishment are more impressive than his. Plaintiff has come far since 9 January 1969. Spence also has improved. However, it is plaintiff who has provided a special place for her children and is presently caring for them in the best tradition of a mother.

In 2 Nelson, *Divorce and Annulment* § 15.09, at 226-29 (2d ed. 1961), it is said: "It is universally recognized that the mother is the natural custodian of her young. . . . If she is a fit and proper person to have the custody of the children, other things being equal, the mother should be given their custody, in order that the children may not only receive her attention, care, supervision, and kindly advice, but also may have the advantage and benefit of a mother's love and devotion for which there is no substitute. A mother's care and influence is regarded as particularly important for children of tender age and girls of even more mature years."

[6]    The trial judge obviously concluded that plaintiff had overcome her emotional problems since her separation from Spence and that the accusations made against her, if once true, were no longer valid. He found, upon supporting evidence, that she is now a stable, fit, and suitable custodian of her children, and their best interests require that their custody be awarded to her. On this record we affirm his award of custody. However, as Justice Frankfurter noted in his dissenting opinion in *Kovacs v. Brewer, supra,* changes in the fitness of custodians and their ability to provide for the needs of a child may develop rapidly. For that reason the jurisdiction of the court to protect infants is "broad, comprehensive, and plenary." *Latta v. Trustees of the General Assembly of the Presbyterian Church,* 213 N.C. 462, 469, 196 S.E. 862, 866 (1938). It is also continuing as long as a minor child whose custody is the subject of a decree remains within its jurisdiction. Upon motion of a party, or upon its own motion, after due notice the court may conduct a hearing to determine whether the decree should be modified. *In re Morris,* 225 N.C. 48, 33 S.E. 2d 243 (1945) ; *Godfrey v. Godfrey,* 228 Ore. 228, 364 P. 2d 620 (1961) ; *Lawson v. Lawson,* 278 Ky. 602, 129 S.W. 2d 135 (1939).

[7]    In view of the evidence in this case which dictated the drastic decree by the Georgia court in 1969, we believe that the district court's obligation to these children requires it to ascertain periodically whether conditions adversely affecting their welfare have developed. In the exercise of our supervisory powers, we so direct.

This cause is returned to the Court of Appeals to the end that it be remanded to the District Court of Forsyth County with directions (1) that at least every six months it obtain from the appropriate social service department of the county a report,

Spence v. Durham

made after due investigation, as to the children's condition, surroundings, and progress and also as to the plaintiff's status and condition and the manner in which she is caring for the children; and (2) that it furnish a copy of each of these reports to each party to this proceeding. Except as thus modified the judgment of the district court will be affirmed. The decision of the Court of Appeals is reversed.

Reversed.

Justice HIGGINS concurring.

The sole question before the Court is this: Did the Court of Appeals commit error of law in reversing the decree of the Forsyth County District Court awarding the custody of Fay Frances Spence (age 10) and Dianne Jeannene Spence (age 8) to their mother?

Beyond question, I think, the district court had jurisdiction of the children and all parties necessary to the determination of their custody. The district judge heard evidence, found facts, and based thereon, entered the custody order.

These questions of law were presented to the Court of Appeals for determination: (1) Did the evidence before the trial judge support his findings? and (2) Do the findings support the custody order? If the answer to both questions is "Yes," the decision of the Court of Appeals should be reversed and the custody order should be affirmed. *Byrd v. Thompson*, 243 N.C. 271, 90 S.E. 2d 394.

Article IV, Sec. 12(1), Constitution of North Carolina, provides: "The Supreme Court shall have jurisdiction to review upon appeal any decision of the courts below, upon any matter of law or legal inference." 1 Strong, N. C. Index 2d, under the heading Appeal and Error, lists many cases supporting the proposition that the jurisdiction of the Supreme Court on appeal is limited to questions of law or legal inference.

The Court of Appeals discussed the Georgia proceeding and the custody order to which the parties gave their consent. The decree established, as of the date of its entry, that the mother was not a suitable custodian. The decree, however, is subject to review upon a showing of material and favorable

changes in conditions. *Griffin v. Griffin,* 237 N.C. 404, 75 S.E. 2d 133. Neither the judgment of the Georgia court nor the agreement of the parties can bind the court and prevent a future hearing on the question of fitness. "No agreement or contract between husband and wife will serve to deprive the court of its inherent as well as statutory authority to protect the interests and provide for the welfare of infants. . . . The child is not a party to such agreement and the parents cannot contract away the jurisdiction of the court which is always alert in the discharge of its duty toward its wards—the children of the State whose personal or property interests require protection. . . . In such case the welfare of the child is the paramount consideration . . . and the court will not suffer its authority in this regard to be either withdrawn or curtailed by any act of the parties." *Story v. Story,* 221 N.C. 114, 19 S.E. 2d 136.

The Georgia decree established as of the date of its rendition the unfitness of the mother for the custody of her children. When a material and favorable change of condition does occur, the courts are open to review former orders and in light of facts existing at the time of the review make such disposition as will be to the best interest of the children. If the court has jurisdiction, and the evidence supports the facts found, which in turn support the judgment, other questions are not presented for decision on appeal. *Bishop v. Bishop,* 245 N.C. 573, 96 S.E. 2d 721. "The findings of fact by the court, there being evidence on both sides, is binding and conclusive on appeal." *Shoaf v. Frost,* 127 N.C. 306, 37 S.E. 271; *In Re Hamilton,* 182 N.C. 44, 108 S.E. 385.

Judge Clifford who heard the witnesses and observed their demeanor as they testified was in a favored position to ascertain the truth. He entered an interlocutory order on July 20, 1971, giving the mother temporary custody. After keeping up with the case until December 20, 1971, he entered the order now under review. The order contains the following:

"5. The two children, Fay and Dianne, while in the custody of their mother, Mrs. Susan Durham Spence, have at all times been well, fully and adequately cared for.

"6. The plaintiff, Susan Durham Spence, is a well educated and intelligent woman who has, since moving to Winston-Salem in the latter part of 1969, established a successful and growing speech therapy clinic for children and

adults. She has rented and furnished a two bedroom apartment in one of the better sections of Winston-Salem which is adequate in all respects for a home for herself and Fay and Dianne. Susan Durham Spence is respected in this community by professional people with whom she deals and is a person of high character and reputation. She is an active member of Trinity Methodist Church where she participates in religious training for children and sings in the choir. She is a person exceptionally well qualified by training and experience to rear children and is in all respects a fit and proper person to have the custody of her two minor children who are subject to this action.

"7. Fay and Dianne Spence have for more than two years resided in the City of Winston-Salem except for holidays and summer vacations. All of their schooling and maintenance and upkeep while in Winston-Salem have been paid for by their mother and maternal grandparents and their father has contributed nothing to their maintenance or schooling or upkeep since June of 1969. The two children have established excellent associations and records in school since they moved here in 1969 and their best interests will be served by their continuing to live and being schooled in this city. It is against the best interest of the children to be moved for extended periods of time and on their holidays from their primary environment. The best interest of these two minor children shall be served by their custody being awarded to their mother, Susan Durham Spence."

Notwithstanding the above, the Court of Appeals not only declared the evidence did not support the findings, but that the findings did not support the judgment.

Particularly in custody cases the trial judge not only is in a position to observe the witnesses, but in this case he observed the parent and the children in the presence of each other. Appellate courts should be slow to take over the job of re-weighing the evidence.

Under our system, appellate courts are not permitted to enter the fact finding field. They should pass on questions of law or legal inference and leave the facts and the equities to the trial court. After all, the chancellor is not given a seat on courts of appeal.

I join in Justice Sharp's opinion.

Justice LAKE dissenting.

I should affirm the judgment of the Court of Appeals. It reversed the judgment of the District Court of Forsyth County, thereby restoring to full force and effect the judgment of the Georgia Court concerning the custody of these two little girls.

To put this case in proper perspective it is necessary first to see exactly what the Georgia Court did and what it did not do. It must be remembered that, at the time the Georgia Court acted, the children and both parents were residents of Georgia. All parties to the present North Carolina action were before the Georgia Court, represented by counsel. All of them, through their counsel, "approved and consented to" the Georgia judgment. It was not, however, a mere perfunctory approval by the court of an agreement of the parties. It recites that it was entered "upon consideration of this case upon evidence submitted as provided by law." Counsel for the maternal grandparents, who obviously were aligned in interest with her, was her uncle. He participated in drafting the judgment.

The Georgia judgment contains no finding of fact. As the majority opinion of this Court now notes, this was, no doubt, the result of a purposeful attempt to spare the innocent children and the innocent grandparents embarrassment. Be that as it may, it has not been contended before this Court that the Georgia judgment was deficient in any respect under the law of Georgia. As such, it must be given full faith and credit by the courts of North Carolina as a determination of the then rights of the parties. Constitution of the United States, Art. IV, § 1; *Allman v. Register*, 264 N.C. 561, 64 S.E. 2d 861. It would, of course, be subject to modification by the courts of North Carolina on the same basis as in Georgia. *Halvey v. Halvey*, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133; *Dees v. McKenna*, 261 N.C. 373, 134 S.E. 2d 644.

The record before us does not leave in doubt the Georgia Court's reason for taking the children from the custody of their mother. In a subsequent order, entered August 23, 1971, adjudging the maternal grandparents in contempt for willful violation of its judgment, the same Georgia Court said:

"The prior misconduct and unfitness of Susan Spence to have unsupervised visitation of the children was the im-

pelling reason for the court's approval of the parties agreement, without which such approval would not have been entered. It was restrictive and intended by the court to be restrictive so as to prevent the mother from instilling tendencies toward sexual aberrations."

The Georgia judgment, after granting an absolute divorce and in addition to detailed provisions about the property rights of the husband and wife and their debts and obligations, not pertinent to this appeal, made these provisions (summarized) concerning the custody of the two little girls, then aged 7 and 5 years:

1. The paternal grandparents (residents of Georgia) were given full custody during June, July and August of each year;

2. The maternal grandparents (residents of North Carolina) were given full custody during the school months, September through May, of each year;

3. The maternal grandparents were given the right to have the children visit them in their own home one weekend in each of the summer months;

4. The paternal grandparents were given the right to have the children visit them in their own home during school holidays—Thanksgiving, Christmas, Easter, etc.

5. The father was given the right, without restriction, to visit the children *in the home of the paternal grandparents* but he was forbidden to remove them therefrom and the paternal grandparents were ordered to prevent him from doing so;

6. The mother was given the right, without restriction, to visit the children *in the home of the maternal grandparents* but she was forbidden to remove them therefrom and the maternal grandparents were ordered to prevent her from doing so;

7. The paternal grandparents were to pay all expenses of the children while they had the custody and the maternal grandparents were to pay all the expenses of the children, including private school expense, while they had the custody;

8. Both the father and the mother were relieved of all obligation to support the children or to reimburse either set of grandparents for any expense incurred by them;

9. Inasmuch as the maternal grandparents resided in North Carolina, and so would remove the children from Georgia periodically, they were required to give a bond in the amount of $10,000, conditioned upon their complying with the judgment and "submitting themselves and said minor children to the jurisdiction of this court for such further hearings and orders as may be heard and passed * * * as if said grandparents and said children were physically within the jurisdiction of this [Georgia] court."

It will readily be observed that the Georgia judgment did not reflect any prejudice against the North Carolina grandparents. The requirement that they post a bond was reasonable. It was designed solely to assure that the children would be returned to Georgia periodically.

It will also be observed that the Georgia judgment did not deprive the mother of the companionship of and the physical care of the children. It permitted her to be with them at will *in the home of her own parents.* There she could play with them, minister to them, cook for them, teach them, live with them nine months of each year and this she did for substantial periods prior to instituting the present action. The sole restriction was that she could not remove them from the general supervision of her own parents. This was by no means a harsh judgment. The testimony of the plaintiff, herself, in the present record shows there was ample justification for the Georgia Court's conclusion that this restriction was necessary to guard the children against the then clear and present danger of corrupt moral teaching, by example, by the mother and her chosen associates.

The wisdom of the Georgia Court's provision for the custody, care, training and maintenance of the two little girls is attested, inadvertently no doubt, by the finding of the District Court that, after the prescribed arrangement had been followed for two years, the children had "established excellent associations and records in school." Nothing whatsoever in the record suggests any deficiency in their care, training or support while in the home of either set of grandparents.

The majority of this Court, and probably the District Court as well, appears to have been led astray by two red herrings

skillfully drawn through the record: (1) The clearly established unfitness of the father to have the custody of any child, and (2) the order of the Georgia Court directing the proceeds of the forfeited compliance bond to be paid to the paternal grandparents.

Neither of these has the slightest bearing upon the question before us, which is the validity of the judgment of the Court of Appeals reinstating the Georgia judgment.

To affirm the Court of Appeals and thus restore full effect to the Georgia judgment clearly precludes the unworthy father from having custody of these children at any time. The Georgia judgment permits him to visit the children *at the home of his parents*. It expressly provides that he is "prohibited from removing the children from the home and said grandparents shall prevent the same." Nothing whatever in the record suggests that in the more than six months during which the paternal grandparents had custody of the girls they ever once failed to comply with this provision of the judgment, or that they would now do so.

It is not for us to review the Georgia Court's order finding the maternal grandparents in contempt for their failure to be equally obedient to the judgment. Nothing suggests any denial of due process of law or any departure from the applicable law of Georgia in this decree, even if we could properly review it. While it is not in accordance with our practice to punish for contempt by levying a fine or forfeiture payable to the litigant who has been injured by the contemptuous conduct (See, *In Re Rhodes*, 65 N.C. 518; *Morris v. Whitehead*, 65 N.C. 637), such practice has long been followed in the federal courts and in the majority of the states. See: *Cary Mfg. Co. v. Acme Flexible Clasp Co.*, 108 F. 875, app. dism., 187 U.S. 427; *French v. Commercial Nat. Bank*, 79 Ill. App. 110; *Bush v. Chenault*, 13 Ky. L. 249; *Chapel v. Hull*, 60 Mich. 167, 26 N.W. 874; *Archer v. Hesse*, 164 App. Div. 493, 150 N.Y.S. 296; *Lorick v. Motley*, 69 S.C. 567, 48 S.E. 614; *Robins v. Frazier*, 5 Heisk. (Tenn.) 100; *My Laundry v. Schmeling*, 129 Wis. 597, 109 N.W. 540.

It is not for us to refuse to give effect to other judgments of courts of a sister state merely because we think their practice in reference to punishment for contempt is not as wise as our own. Certainly, a court of North Carolina should not be permitted by us to change the custody of two little girls, who have

been admirably cared for by their Georgia grandparents, in reprisal for an order of forfeiture which to us may seem harsh and unwise. Nor is the amount of the forfeiture shocking. Ten thousand dollars is surely not an excessive award when the wrong done is the taking of two cherished granddaughters and the placing of them in the permanent custody of a person morally unfit to rear them.

At the time of the Georgia judgment these were Georgia children, wards of the Georgia Court. The Georgia Court was under no obligation to permit them to be brought to North Carolina. It did so in reliance upon the solemn undertaking of the maternal grandparents, "approved and consented to" by the mother, to bring them back at the appointed time. What the District Court has done, now approved by the majority opinion, invites reprisals by the courts of Georgia, and other courts, against custody decrees of North Carolina courts in comparable cases. Inevitably, it will also make courts of other states reluctant to permit a custodian of children to bring them into this state to visit relatives or for any other purpose.

It is true, as the majority opinion states, that the courts of North Carolina are not without jurisdiction to inquire into the present needs of children within this State and to make appropriate orders concerning their present and future custody. G.S. 50-13.5. North Carolina courts have such power even though the children came here from another state whose courts have previously entered a then valid judgment as to their custody. The most elementary principles of comity, however, dictate that the courts of this State be at least as cautious about modifying the valid judgment of another state's court as they are about modifying a like decree of another North Carolina court. To do otherwise invites parties dissatisfied with the other state's judgment in a custody case to bring the children here for the fraudulent purpose of evading their obligations under it and seeking sanctuary. The Georgia Court's action against the maternal grandparents on their bond was clearly due to its belief that this is what they had done. The record lends support to that view. It shows clearly that the mother, herself, intended from the beginning so to nullify the Georgia judgment.

The guiding principle in custody cases in this State, as in Georgia, is that the welfare of the children—the wards of the court—takes precedence over all else. *Shepherd v. Shepherd*, 273 N.C. 71, 159 S.E. 2d 357; *Brake v. Mills*, 270 N.C. 441, 154 S.E.

2d 526; *Wilson v. Wilson,* 269 N.C. 676, 153 S.E. 2d 349; Lee, North Carolina Family Law, § 224. It takes precedence over the welfare of the mother, over her desire to have her children in her own home, over her resentment against her own parents' court-given power to veto her wishes concerning the children, over her hostility to the paternal grandparents, over the love and concern of either set of grandparents.

When, however, a court of competent jurisdiction in this or another state has adjudged these matters, the District Court of Forsyth County is not authorized to change that adjudication merely because it would originally have entered a different decree. The custody plan previously decreed by the Georgia Court can lawfully be changed by a court of this State only for a substantial change in conditions, not because the North Carolina judge has different sociological or philosophic views from those of the Georgia Court, or because he is more sympathetic to the claimant who resides in his jurisdiction. *Shepherd v. Shepherd, supra; Stanback v. Stanback,* 266 N.C. 72, 145 S.E. 2d 332. There is no such change of condition as will justify a change in the former judgment, unless it can reasonably be believed that, had the present condition existed at the earlier date, the former decree would not have been entered by the court in which it was entered. See: *Neighbors v. Neighbors,* 236 N.C. 531, 73 S.E. 2d 153; Lee, North Carolina Family Law, § 226; 24 AM. JUR. 2d, Divorce and Separation, § 819; Annot., 9 A.L.R. 2d 629, § 3.

It thus becomes necessary to inquire into the conditions prevailing at the time of the Georgia judgment which caused the Georgia Court to reach the drastic conclusion that these two exceptionally promising little girls must never again be in the custody of either their father or their mother. Those conditions were known to the Georgia Court through "evidence submitted as provided by law." They were known to both sets of grandparents and, of course, both the father and the mother. Both parents and all four grandparents "approved and consented to" the determination of the Georgia Court that the mother (like the father) was not a person into whose hands the care and training of young girls could be entrusted, in whose home the girls could be left to reside. The same Georgia Court in 1971 said its reason for its custody order was "the prior misconduct and unfitness of Susan Spence" showing danger that the mother would instill tendencies toward "sexual aberrations" in the girls.

Spence v. Durham

Obviously, the District Court's statement to the contrary notwithstanding, the fact that the children are now 11 and 9 years of age, instead of 7 and 5, as they were then, has not lessened the danger.

The majority opinion says, quite appropriately, that the admissions of each of these parents, and corroborative evidence, establish the existence of "a situation in their home * * * which was beyond the pale of the most permissive society." The majority opinion then says: "We proceed on the *assumption* that the Georgia Court was of the opinion that both [the father] and [the mother] were *emotionally disturbed* and unstable and * * * [w]e can think of no other reason for the judgment the court entered." (Emphasis added.)

This is not correct. The record shows the Georgia Court's drastic order, approved by the plaintiff's parents, was not entered because she was "emotionally disturbed and unstable." It was entered because she was deemed *morally* unfit to be entrusted with the custody of two little girls. There is a great difference between these two conditions which ought not to be obscured by the use of euphemistic terms. Emotional disturbance and instability are not the same thing as moral depravity or utter lack of moral perception and principle. It is a mistake for courts to equate the two and to proceed on the assumption that absence of moral character is a mere sickness curable by psychiatric consultations and treatments.

We are dealing in this case with a subject matter unsurpassed in importance by that of any litigation coming before this Court—the right of children to be reared in a home conducive to the development of their own character. It should not be befogged by euphemisms. It is not desirable to set out in the report of this decision all of the sordid details of the evidence supporting the Georgia judgment. However, in order to determine whether there has been a *showing* of a change of the crucial condition on which that judgment was based, we must state frankly, not euphemistically, what the condition was. It is the plaintiff mother who makes this necessary by instituting this proceeding for the purpose of nullifying the judgment to which she gave her consent and approval, however lacking in good faith that consent may now appear to have been.

There is an abundance of evidence in the record before us to show that for a substantial period of time prior to and culminating in the Georgia judgment:

1. The father habitually committed adultery, maintaining his mistress, a teenage girl, in the home where he and the mother lived with these children;

2. The mother consented to, condoned, encouraged, aided and abetted in this conduct, going so far as to turn over and go to sleep without protest when awakened by the father and his mistress engaging in sexual intercourse while in the same bed with her, and thereafter serving them breakfast in bed; and

3. The mother made homosexual advances to various teenage girls visiting in her home, sometimes in the presence of her two daughters, then mere infants, the general course of these actions being with the knowledge and consent of the father, her husband.

An especially pertinent and revealing statement by the plaintiff mother in her testimony before the District Court, and therefore bearing upon her present ideals and principles, was that she could not throw her husband's mistress out of the house because she tried to treat the mistress *"as a daughter"* and so the situation, in her mind, was "the same as if he had an affair with Dianne [one of the little girls]," in which case she "wouldn't want to throw anybody out." When, to illustrate her continuing affection for her husband's mistress, the plaintiff testifies that she could not force anyone to leave her home in order to break up an incestuous affair with her own little girl, it can hardly be said that there is substantial evidence of a change in the condition on which the Georgia judgment rests.

At the conclusion of the plaintiff's evidence the appellants moved for dismissal on two grounds: (1) The evidence showed no change of condition since the Georgia judgment; (2) this action is the culmination of a fraud on the Georgia Court. The District Court should have allowed the motion on both grounds.

The plaintiff's evidence shows beyond question that at the time she and the maternal grandparents approved and consented to the Georgia judgment and gave the bond to secure their compliance with it, it was the plaintiff's purpose and intent to get the children to North Carolina by this device and to institute an action here, in what she believed would be a more favorable judicial climate, to gain their custody. While the maternal grandparents complied with the provisions of the Geor-

gia judgment prior to the institution of this action in the District Court of Forsyth County, the testimony of the maternal grandmother shows clearly her own sympathy with this fraudulent purpose of the plaintiff. A court of this State may not properly lend itself to the perpetration of such a fraud upon the court of a sister state.

The plaintiff's evidence shows no change in the condition on which the Georgia Court properly rested its judgment. Her testimony in this action is not that she *no longer* has homosexual tendencies. Her testimony is that she *never* had them. This is not evidence of a *change* in condition.

Her psychiatric expert witness testified on the basis of a single one-hour consultation, conducted after this action was instituted, not for treatment but solely to enable him to testify as to her present "fitness as a mother." He did not mention, and obviously could not know, her condition at the time of the Georgia judgment. The plaintiff's testimony shows she had psychological consultations not long prior to the Georgia judgment, but, for reasons not disclosed, the Georgia psychologist was not called to testify. This is not evidence of a *change* of condition.

The plaintiff's psychiatric expert witness gave the startling testimony that in his opinion homosexual tendencies in the plaintiff would have no bearing on her "fitness as a mother" to have the sole custody of two little girls. Passing over other appropriate characterizations of this "expert opinion," it suffices, for the present, to observe that it has no tendency to show any change of condition. Furthermore, the question of the plaintiff's "fitness as a mother" to have sole custody of these children is not a matter for expert opinion testimony. That is the ultimate question to be determined by the court. The Georgia Court determined it adversely to the plaintiff. Its determination is binding on the courts of this State in absence of a clear showing of a *change* in the condition on which its judgment was based. The Full Faith and Credit Clause, Art. IV, § 1, of the Constitution of the United States requires more than lip service by the courts of North Carolina when called upon to disregard and change a judgment rendered by a Georgia court which had jurisdiction both over the subject matter and over the parties.

The District Court's findings of fact, assuming adequate support therefor in the evidence, do not support its judgment

---

---

because they do not show any change in condition. Let us examine them, summarized and renumbered:

    (1) The plaintiff is a member of the Methodist Church, participates in its activities, sings in the choir and takes the children regularly to Sunday school.

These are, per se, laudable, but they do not, per se, show she subscribes to or complies with those principles of sexual morality which, notwithstanding her psychiatric expert's contrary opinion, society generally still deems essential to the custodian of little girls. More significant for our purposes, this finding shows *no change* in condition, for the plaintiff, herself, testified in the District Court that while living in Georgia, prior to and at the time of the Georgia judgment, she was a member of the Methodist Church and was as active in its assemblies as the then age of her children permitted.

    (2) The plaintiff keeps the children clean and neat, well fed, supplied with proper toys, in a "nice neighborhood," sees them across the street to and from school and spends time with them.

These too are laudable, per se, but do not, per se, show she subscribes to and complies with the above mentioned principles of morality. Again, these too are not findings of a change of condition, for the plaintiff's own testimony, not challenged by the appellants, is clear and explicit to the effect that all these things she did in Georgia before and at the time of the Georgia judgment.

    (3) The plaintiff is a well educated woman.

So she is and so she was in Georgia. She had a Master's degree when living with her husband and his mistress.

    (4) The plaintiff has professional competence, is well respected by her profession as a competent speech therapist and is financially successful in her practice.

So she is and so she was in Georgia while living with her husband and his mistress, according to her own testimony.

The Georgia Court rendered its judgment on the basis of an opinion, apparently not shared by the plaintiff's psychiatric expert witness, that good personal moral standards are indispensable in a fit custodian for small girls and that professional

competence, superior education, financial success, a residence in a "nice neighborhood," personal cleanliness, a neat apartment and active participation in church work do not guarantee such moral standards. This Court also has recognized the greater importance of intangible attributes of character as compared with material comforts in awarding custody of children to a relative in preference to either parent. *Brake v. Mills, supra.*

This conclusion of the Georgia Court was with the "approval and consent" of all parties before it. Its soundness is a matter of common knowledge and so an appropriate subject of judicial notice. The judgment based thereon is binding on the courts of this State until there is a clear showing of a change in condition. There is no such showing here.

It is not a light thing to take children from the custody of a mother—or of a father. The Georgia Court did not so regard it. It has been customary, when children are small, to regard the mother as the more natural custodian when divorce disrupts the home. In part this is tradition, stemming from the fact that the father is normally the provider of support and so is unable to spend as much time at home, and from the usually greater tenderness of a woman's nature. It is due in part to the ingrained habits of chivalry and to the resulting sheltered protection of women from contact with degrading influences. Now, however, a permissive society has "liberated" women, if so inclined, to inquire into, discuss, experiment with, condone and practice all of the vices which the most depraved of men have practiced since the days of Abraham. Consequently, courts of the present day must put into practice in custody cases the realism on which current society prides itself. In awarding the custody of children we must remember that the process of giving birth does not automatically transform a woman into an exemplification of the 31st Chapter of Proverbs. This is not to negate the great truth of reformation of character, nor is it to equate isolated instances of misconduct, even gross, with lack of moral character, but in absence of evidence of a change in this fundamental condition on which the Georgia Court based its judgment the courts of this State may not properly set it aside.

The District Court, in addition to its findings of fact mentioned above, also included in its judgment the following statements which it denominated findings of fact:

"6. Susan Durham Spence * * * is in all respects a fit and proper person to have the custody of her two minor children * * *;

"7. The best interest of these two minor children shall be served by their custody being awarded to their mother * * *;

"8. The maternal grandparents Durham and the paternal grandparents Spence are all fit persons to have the custody of Fay and Dianne. All four grandparents however are of such age that the best interest of the two children will be served by awarding primary custody to their mother. * * *

"10. * * * [T]here have been substantial changes in conditions since June 2, 1969 * * * including * * *:

"a. * * * Susan Durham Spence is now a fit and proper person to have the custody of her children;

"b. Today Susan Durham Spence is a well adjusted emotionally stable individual fully capable of caring for and rearing Fay and Dianne; * * *

"d. * * * The grandparents Spence and Durham are not as able to respond to the daily needs of two small girls as they were on June 2, 1969. * * *"

Under the caption, "CONCLUSIONS OF LAW," the District Court repeated the statements:

"Susan Durham Spence is a fit and proper person to have the exclusive custody of her two minor children * * *;

"The best interest of Fay and Dianne dictate that their custody be awarded to their mother."

I have found absolutely no evidence in the record to support the finding that the Spence and Durham grandparents are no longer able by reason of age, health, financial condition or any other circumstance "to respond to the daily needs of these little girls." The Spence grandparents, at least, are begging to be allowed to do so. There is no evidence as to their age or health. The only evidence as to Mr. Durham's health is that he was unable to attend the hearing in the District Court due to a temporary illness. Both couples appear to be in as good financial condition as when they all "approved and consented to" the

Georgia judgment. At the time of the Georgia judgment the little girls were 7 and 5 years of age. Now they are 11 and 9. The physical demands and strains of caring for a 5-year-old are immeasurably greater than those of fulfilling the "daily needs" of a 9-year-old. The needs of the maturing child are more in the realm of counselling and less in the realm of physical care and play and physical policing. There is obvious inconsistency in the District Court's saying in one breath that the grandparents are all "fit persons to have the custody" and in the next that they are too old to be permitted to have it. This is a crucial "finding," if it be a finding. As a finding, it lacks support in the evidence. As a conclusion, it is patently erroneous for, of necessity, in view of the absence of evidence bearing thereon, it is a conclusion that no grandparents are as competent custodians as is every mother. We cannot determine to what extent the District Court rested its decree upon this wholly arbitrary and unsupported declaration. For this reason alone, if there were no other, the Court of Appeals was within its authority in reversing the judgment of the District Court.

The declarations "fit and proper person to have the custody," "best interest of these minor children" and "fully capable of caring for and rearing Fay and Dianne" are not findings of fact. As Justice Parker, later Chief Justice, said in the case of *Thomas v. Thomas,* 259 N.C. 461, 130 S.E. 2d 871, and Justice Denny, later Chief Justice, said in the case of *In Re Kimel,* 253 N.C. 508, 512, 117 S.E. 2d 409, these are conclusions of the trial judge upon the ultimate issue. There is no accepted standard of "fitness" to have custody of children. There is no accepted standard for determining the "best interest" of a child with reference to his or her custodian. These are not matters which can be "found." These are matters calling for the exercise of the subjective judgment of the court. Its conclusions thereon are subject to review by the appellate court.

To say, as the majority opinion seems to intimate, that these conclusions on the ultimate, crucial question in the case are findings of fact and, therefore, not subject to review on appeal if there be the slightest competent evidence in the record to support them, makes any District Judge in North Carolina the absolute Czar in determining the custody of children. No more important litigation can come before the courts and, obviously, it is in the District Court that pressures of local social and political influences are strongest.

Furthermore, to say that, if there is *any* competent evidence to support the District Court's "finding" of good character and fitness, no appellate court can reverse a custody award based thereon is not sound in law or in policy. It is inconceivable that there will arise any contested custody case in which there will not be *some* testimony of good character and fitness of each claimant. The claimant, by his or her own testimony, can supply it and few men or women are so depraved as to be completely lacking in attractive attributes or as to be unable to find some relative or acquaintance who will testify to good character and behavior. Testimony as to character is competent in custody hearings, and so is the claimant's own denial of charges of misconduct, but neither is sufficient to put the District Court's conclusion as to "fitness" as custodian of children beyond the reach of an appellate court on review.

Custody hearings are equitable in nature, the child being the ward of the court, even though the procedure is now regulated to some degree by statute. *In Re Custody of Sauls*, 270 N.C. 180, 186, 154 S.E. 2d 327. Lee, North Carolina Family Law, § 226; Clark, Law of Domestic Relations, § 17.1; Pomeroy, Equity Jurisprudence, § 1307; 24 AM. JUR. 2d, Divorce and Separation, § 772. While, in the exercise of this equitable jurisdiction, the trial court has broad discretion and its determinations are not lightly to be set aside on appeal, the appellate court in equity has, and traditionally exercises, much more extensive powers of review than does the appellate court in law over determinations of fact. This greater power of review of the appellate court in equity extends to custody cases and to the determination therein of the fitness of claimants and the best interest of children. See: *In Re Kimel, supra; In Re Turner*, 151 N.C. 479, 66 S.E. 431; Lee, North Carolina Family Law, § 224; McClintock, Handbook on the Principles of Equity, 2d Ed, § 54; Nelson, Divorce and Annulment, 2d Ed, §§ 15.50 and 30.10; 24 AM. JUR. 2d, Divorce and Separation, § 779.

In its so-called Finding of Fact Number 10, purporting to show changes in condition since the Georgia judgment, the District Court injected many conclusions. The actual findings of fact therein are either not supported by the evidence or are unrelated to the condition which was the basis for the Georgia judgment. Thus, the so-called Finding of Fact Number 10 does not constitute a proper finding of a change of condition and does not afford a proper basis for the order of the District Court.

The plaintiff, by virtue of the District Court's interlocutory order awarding her the custody of the children until the hearing, had them in her custody for five months prior to the hearing. The District Court relied heavily on absence of a showing that this five-month period produced a deterimental effect on the children. The plaintiff is quite obviously a woman of intelligence, highly educated, especially adept in the field of psychological tests and measurements. She, far more than the average person, could succeed in making a favorable showing on the tests given by her psychiatric expert witness during his one-hour interview with her. It is hardly surprising that during the five-month test period given her by the District Court, awaiting the hearing of her case and knowing the nature of the charges likely to be made against her, the plaintiff complied with the customary standards of society and of motherhood. Good behavior for so short an interval with so much at stake is not sufficient evidence on which to predicate a finding of a change in moral principles. To take these little girls from the homes of grandparents under whose affectionate and watchful care they have done exceptionally well and to give them into the sole custody of this plaintiff, in view of her established record of behavior, is an abuse of the discretion vested in the District Court even if its conclusions could properly be deemed findings of fact.

We should, therefore, affirm the judgment of the Court of Appeals.