MILDRED BORYS AND JOHN BORYS, PLAINTIFFS-APPEL-
LANTS, v. NANCY JEAN BORYS, DEFENDANT-RESPON-
DENT.

Argued October 31, 1977—Decided February 8, 1978.

Opinion filed April 25, 1978.

104

*Mr. Dennis Alan Auciello* argued the cause for appellants.

*Mr. Herbert B. Bierman* argued the cause for respondent.

PER CURIAM. This case presents a substantial federal constitutional question. The Appellate Division held that the full faith and credit clause does not compel recognition of a sister state decree which purports to alter the custody of minor children domiciled in New Jersey. We affirm.

## I

Nancy Jean and William John Borys were married in New Jersey in 1969, and moved to Florida the following year. They had two children, William John Borys, Jr., born in New Jersey in 1969, and Marlo Jean Borys, born in Florida in 1970. The mother and children returned to New Jersey in February, 1973, and the Boryses were granted a Florida divorce four months later. The divorce decree awarded permanent custody of the children to the mother.

The father, who had remained in Florida, later sought to change the custody order. Both parents appeared. In an order entered September 16, 1974, the court vacated its original order, continued custody with the mother on a temporary basis, and gave the father visitation rights in Florida. The court retained jurisdiction to enter further custody orders. In December, 1974 the Florida court informally interceded to require the father to return the children to the mother after a visit. On August 27, 1975 the mother again sought assistance from the Florida court when the father failed to return the children at the conclusion of their visit. At that time the father was also alleged to be in arrears in his child support payments. Meanwhile, the paternal grandparents, Florida residents, had petitioned the court (with their son's consent) to award them custody of the children. The court arranged for the children to be returned to their mother in New Jersey upon the mother's stipulation that the children would be returned to Florida for a custody hearing.

In accordance with the Florida court's instructions, the paternal grandparents paid the travel expenses of the mother and children for a hearing in Florida on September 11, 1975. Although the mother reported to the judge's chambers on September 10, she and the children did not appear at the hearing. Instead, they returned to New Jersey, allegedly upon the advice of Florida counsel. Notwithstanding their absence, the court proceeded to hear testimony from the children's father and paternal grandparents and one of the grandparents' neighbors. All four witnesses were examined by the grandparents' attorney. Neither the mother nor the father was represented by counsel. The court also had before it two letters concerning the mother's care of the children from the New Jersey Division of Youth and Family Services, dated November 20, 1974 and September 26, 1975, and a letter concerning the son from the Raritan Bay Mental Health Center to the Division of Youth and Family Services. Finally, the court directed the Circuit Court Counselors Office to investigate the grandparents' suitability as custodians. On January 20, 1976 the Florida court entered an order which held the mother in contempt and awarded permanent custody of the children to the grandparents. This order could not be enforced because the children were no longer in Florida.

On February 5, 1976, the mother started custody proceedings in New Jersey. Her complaint recited the existence of the Florida order, but asserted that the Florida court had lacked jurisdiction. The grandparents initiated a separate Chancery Division action on February 13, 1976, seeking recognition and enforcement of the Florida custody award. The mother and grandparents moved for summary judgment in their respective actions, and the mother also moved for consolidation. The Chancery Division denied the motion for consolidation and ordered summary judgment for the grandparents on the ground that the mother had not alleged any changed circumstances since entry of the Florida order. The Appellate Division correctly reversed and remanded

for a plenary hearing on the consolidated complaints. The grandparents appealed as of right, there being a substantial constitutional issue. *R.* 2:2–1(a). After hearing oral argument we entered an order affirming the judgment below and indicating that an opinion would be filed in due course. 76 *N. J.* 103 (1978). See *Dolan v. Tenafly,* 75 *N. J.* 163 (1977). We followed this procedure in the interest of informing all parties of our decision as soon as possible, since this case involves the sensitive matter of children's custody. In light of the importance of the question presented and the lack of authoritative precedent, we now set forth at some length our reasons for affirming the Appellate Division's decision.

## II

The full faith and credit clause states:

Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof. [*U. S. Const.* Art. IV § 1]

Congress has directed that judicial proceedings

\* \* \* shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken. [28 *U. S. C. A.* § 1738]

In interpreting the full faith and credit clause, courts must reconcile the apparent simplicity of this statutory and constitutional language with the complexity of interstate relations in a federal system. This reconciliation has been especially difficult in domestic relations cases in general and in custody litigation in particular. See *Williams v. North Carolina,* 317 *U. S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279 (1942) (divorce); *Williams v. North Carolina,* 325

*U. S.* 226, 65 *S. Ct.* 1029, 89 *L. Ed.* 1577 (1945) (divorce) ; *Yarborough v. Yarborough,* 290 *U. S.* 202, 54 *S. Ct.* 181, 78 *L. Ed.* 269 (1933) (child support) ; Jackson, "Full Faith and Credit — The Lawyer's Clause of the Constitution," 45 *Colum. L. Rev.* 1, 14 (1945).

The full faith and credit clause, which was derived from a similar provision in the Articles of Confederation, received little attention during the constitutional convention and the ratification debates. The scanty history does suggest, however, that the framers were concerned primarily with enforcement of money judgments.[1] It is not surprising that the clause has been applied rigorously to such judgments, regardless of the underlying cause of action. See *Milwaukee County v. M. E. White Co.,* 296 *U. S.* 268, 56 *S. Ct.* 229, 80 *L. Ed.* 220 (1935) (tax deficiency judgment) ; *Fauntleroy v. Lum,* 210 *U. S.* 230, 28 *S. Ct.* 641, 52 *L. Ed.* 1039 (1908) (gambling debt). As the United States Supreme Court explained,

---

[1]Prior to the Articles of Confederation, the colonial legislatures had grappled with the problem of the effect to be given to foreign judgments. As early as 1650, Connecticut enacted a law granting recognition to judgments from colonies with reciprocal provisions. Sumner, "The Full-Faith-and-Credit Clause — Its History and Purpose," 34 *Ore. L. Rev.* 224, 227 (1955). Several other colonies addressed the problem, most notably Massachusetts in 1774. The preamble to the Massachusetts statute clearly stated that it was intended to prevent the development of the colony as a debtor's haven. Nadelmann, "Full Faith and Credit to Judgments and Public Acts," 56 *Mich. L. Rev.* 33, 40 (1957). The sole comment in *The Federalist* on the constitutional clause echoed this concern :

The power here established may be * * * particularly beneficial on the borders of contiguous States, where the effects liable to justice may be suddenly and secretly translated, in any stage of the process, within a foreign jurisdiction. [*The Federalist*, No. 42]

It is also noteworthy that the constitutional convention debate on full faith and credit was closely linked to discussion of the bankruptcy power. 2 *Farrand, Records of the Federal Convention of 1787*, 448 (1911) ; *Nadelmann, supra*, at 56–57.

[t]hese consequences flow from the clear purpose of the full faith and credit clause to establish throughout the federal system the salutary principle of the common law that a litigation once pursued to judgment shall be as conclusive of the rights of the parties in every other court as in that where the judgment was rendered, so that a cause of action merged in a judgment in one state is likewise merged in every other. The full faith and credit clause like the commerce clause thus became a nationally unifying force. It altered the status of the several states as independent foreign sovereignties, each free to ignore rights and obligations created under the laws or established by the judicial proceedings of the others, by making each an integral part of a single nation, in which rights judicially established in any part are given nation-wide application. [*Magnolia Petroleum Co. v. Hunt*, 320 *U. S.* 430, 439, 64 *S. Ct.* 208, 214, 88 *L. Ed.* 149 (1943)]

██ Finality has little meaning, however, in the context of child custody adjudication. A custody decree is purely prospective, intended to secure the future welfare of the child. *Fantony v. Fantony*, 21 *N. J.* 525, 536 (1956). Further, the decree may have serious consequences for some who are not parties to the litigation, namely, the child and its state of residence. Since the conditions which would satisfy the best interests of the child during all of its minority could not be conclusively determined in one decree, custody orders are uniformly held to be modifiable. See *Restatement (Second), Conflict of Laws,* § 79, comment b.

██ The power of a forum state to modify a foreign custody decree consistently with the full faith and credit clause was recognized by the United States Supreme Court in *New York ex rel. Halvey v. Halvey*, 330 *U. S.* 610, 67 *S. Ct.* 903, 91 *L. Ed.* 1133 (1947). Mrs. Halvey left her husband in New York and took their child to Florida, where she ultimately obtained an *ex parte* divorce. On the day before the Florida court awarded permanent custody of the child to Mrs. Halvey, Mr. Halvey clandestinely returned to New York with the child. When Mrs. Halvey initiated a *habeas corpus* proceeding in New York to recover the child, the New York court modified the Florida order to grant Mr. Halvey visitation rights. The Supreme Court affirmed:

So far as the Full Faith and Credit Clause is concerned, what Florida could do in modifying the decree, New York may do. * * * * The general rule is that this command requires the judgment of a sister State to be given full, not partial, credit in the State of the forum. * * * * But a judgment has no constitutional claim to a more conclusive or final effect in the State of the forum than it has in the State where rendered. * * * * Whatever may be the authority of a State to undermine a judgment of a sister State on grounds not cognizable in the State where the judgment was rendered (Cf. Williams v. State of North Carolina, 325 U. S. 226, 230, 65 S. Ct. 1092, 1095, 89 L. Ed. 1577, 157 A. L. R. 1366), it is clear that *the State of the forum has at least as much leeway to disregard the judgment, to qualify it, or to depart from it as does the State where it was rendered.*

*   *   *   *   *   *   *   *

The narrow ground on which we rest the decision makes it unnecessary for us to consider several other questions argued, e. g., whether Florida at the time of the original decree had jurisdiction over the child, the father having removed him from the State after the proceedings started but before the decree was entered; whether in absence of personal service the Florida decree of custody had any binding effect on the husband; whether the power of New York to modify the custody decree was greater than Florida's power; whether the State which has jurisdiction over the child may, regardless of a custody decree rendered by another State, make such orders concerning custody as the welfare of the child from time to time requires. On all these problems we reserve decision. [330 *U. S.* at 614–16, 67 S. Ct. at 906, 91 *L. Ed.* at 1136–37 (footnote omitted; *emphasis added*)]

Three justices concurred in the result.

In *May v. Anderson,* 345 *U. S.* 528, 73 *S. Ct.* 840, 97 *L. Ed.* 1221 (1953), the Supreme Court held that the forum was not required in a *habeas corpus* proceeding to give full faith and credit to a custody decree embodied in a foreign *ex parte* divorce judgment. The divorce was granted by Wisconsin, which had been the marital domicile. Before the petition for divorce was filed, however, the wife had taken the children to Ohio, where she was served with process under a Wisconsin matrimonial long-arm provision. The Wisconsin divorce granted custody to the father, who sought to enforce the decree in an Ohio *habeas corpus* proceeding. The Ohio courts ruled that they were obligated by the full

faith and credit clause to honor the Wisconsin order. Justice Burton wrote for a bare majority that Wisconsin never obtained personal jurisdiction over the mother and therefore the Wisconsin custody decree was not entitled to full faith and credit. Justice Frankfurter joined in the Burton opinion, but filed a concurrence which presented a markedly different interpretation of the majority rationale. According to him, the Court's decision was based on the inappositeness of the full faith and credit clause to custody determinations. Justice Frankfurter advanced a thesis he would develop more fully in subsequent decisions: "Children have a very special place in life which law should reflect. * * * [T]he child's welfare in a custody case has such a claim upon the State that its responsibility is obviously not to be foreclosed by a prior adjudication reflecting another State's discharge of its responsibility at another time." 345 *U. S.* at 536, 73 *S. Ct.* at 844, 97 *L. Ed.* at 1228. Although they dissented, Justices Jackson and Reed observed:

And, of course, no judgment settling custody rights as between the parents would itself prevent any state which may find itself responsible for the welfare of the children from taking action adverse to either parent. [345 *U. S.* at 542, 73 *S. Ct.* at 847, 97 *L. Ed.* at 1231]

Justice Minton also dissented.

Five years later the Supreme Court again refused to rule on the applicability of the full faith and credit clause to custody decrees in *Kovacs v. Brewer,* 356 *U. S.* 604, 78 *S. Ct.* 963, 2 *L. Ed.* 2d 1008 (1958). A New York divorce decree awarded custody of a minor child to her grandfather. In accordance with the decree the child went to live with him in North Carolina. The child's mother obtained a custody order after a contested proceeding in New York but did not seek to enforce the order in North Carolina until a year later. North Carolina awarded custody to the grandfather. In a brief opinion which relied on *New York ex rel. Halvey v. Halvey, supra,* eight justices noted that the New York decree was modifiable on a showing of changed

circumstances, and that the North Carolina court might have based its decision on this ground. If so, the New York decree was not conclusive. Therefore, the case was remanded for clarification of the grounds of decision. Justice Frankfurter's dissent repudiated his position in *Halvey* and developed his concurrence in *May*. He strongly questioned whether full faith and credit was owed to any child custody decrees, and he would have held flatly that no deference was due to the decree in *Kovacs*:

The minimum nexus between court and child that must exist before the court's award of the child's custody should carry any authority is that the court should have been in a position adequately to inform itself regarding the needs and desires of the child, of what is in the child's best interests. And the very least that should be expected in order that the investigation be responsibly thorough and enlightening is that the child be physically within the jurisdiction of the court and so available as a source for arriving at Solomon's judgment. [356 *U. S.* at 614, 78 *S. Ct.* at 969, 2 *L. Ed.* 2d at 1015]

Finally, in *Ford v. Ford*, 371 *U. S.* 187, 83 *S. Ct.* 273, 9 *L. Ed.* 2d 240 (1962), the Court reversed a South Carolina decision which had enforced a settlement in a Virginia custody suit. South Carolina had reasoned that the judgment embodying the settlement was *res judicata* in Virginia and therefore binding on the South Carolina court under the full faith and credit clause. A unanimous United States Supreme Court ruled that South Carolina had misconstrued Virginia law on the effect of a judgment incorporating the custody terms included in a settlement agreement. Once again the Court reserved decision on the broader issue of full faith and credit in custody disputes. In order to do so, however, the Court resorted to a reading of Virginia law which one commentator tactfully described as "imaginative" and "strikingly original." Note, *Ford v. Ford: Full Faith and Credit to Child Custody Decrees?*, 73 *Yale L. J.* 134, 138, 142 (1963).

In the fifteen years since *Ford*, the Court has not returned to the issue. Only last term it declined to review

an interstate custody case. See *Borri v. Siverson,* 336 *So.* 2d 353 (Fla. Sup. Ct. 1976), *cert.* denied, 429 *U. S.* 1079, 97 *S. Ct.* 824, 50 *L. Ed.* 2d 799 (1977), *rehearing* denied, 430 *U. S.* 941, 97 *S. Ct.* 1573, 51 *L. Ed.* 2d 789 (1977) (no full faith and credit to foreign custody decree). Thus, only two of the questions posed by the *Halvey* court, see page 112 *supra,* have been resolved. First, full faith and credit does not preclude modification of a custody decree by the forum state on grounds permitted by the law of the rendering state, *Halvey, supra.* Second, the forum state need not enforce a custody decree rendered without personal jurisdiction over the noncustodial parent, *May v. Anderson, supra.* The issue in the present case remains open: whether the full faith and credit clause requires a foreign custody decree to be given conclusive effect, subject only to modification in accordance with the law of the rendering state. The studied silence of the United States Supreme Court on this question for over three decades buttresses Brainerd Currie's observation following *Ford v. Ford, supra*: "Rather clearly, the Court is reluctant to hold that custody decrees are entitled to conclusive effect in other states, for the simple reason that no prudent and humane society could tolerate such a rule * * *." Currie, "Full Faith and Credit, Chiefly to Judgments: A Role for Congress," 1964 *Sup. Ct. Rev.* 89, 109–10.

## III

A majority of American jurisdictions theoretically adhere to the "changed circumstances" rule approved in *Halvey, supra.* A child custody decree issued by a court of a sister state which properly acquired jurisdiction will be given full faith and credit absent a showing of changed circumstances warranting modification of the custody order. See Annot., "Extraterritorial effect of valid award of custody of child of divorced parents, in absence of substantial change in circumstances," 35 *A. L. R.* 3d 520, 538–49 (1971). The re-

sult of litigation in these jurisdictions, however, is far from uniform. Compare *Fersler v. Ferster*, 220 *Ga.* 319, 138 *S. E.* 2d 674 (Sup. Ct. 1964) (changed circumstances strictly construed) with *Spence v. Durham*, 283 *N. C.* 671, 198 *S. E.* 2d 537 (Sup. Ct. 1973) (trial court has broad authority to inquire into changed circumstances) and *Kennedy v. Carman*, 471 *S. W.* 2d 275 (Mo. Ct. App. 1971) (court should determine custody if judicial inaction would jeopardize child's welfare and decree will be enforceable). Empirical studies reveal that the merits of foreign custody decrees are frequently reexamined, especially when they affect existing family groups in the forum state. Ehrenzweig, "Interstate Recognition Custody Decrees: Law and Reason versus the Restatement," 51 *Mich. L. Rev.* 345, 348 (1953); Stansbury, *Custody and Maintenance Law Across State Lines*, 10 *Law & Contemp. Prob.* 819, 829–30 (1944).

: A court can circumvent the changed circumstances rule in several ways. First, the forum state can deny recognition to the foreign decree for lack of jurisdiction. This theory is easy to invoke if, for example, the child was not before the court which rendered the custody decree.

Random analysis shows that this "jurisdictional" approach, far from being dictated by logical necessity, is generally chosen in legalistic support of more pertinent considerations, such as the unreliability, from the standpoint of the child's welfare, of "migratory divorce" decrees or of custody awards made in the child's absence.
   [*Ehrenzweig, supra*, at 349]

Even if the foreign decree survives a jurisdictional challenge, the forum can modify the decree based on a finding that circumstances have changed since the decree was entered.

[T]he term "change in conditions" is sufficiently broad to make it possible for a court to escape what it might otherwise feel to be an obligation to recognize an earlier award *"* * through resort to the simple expedient of requiring little evidence of change. [*Stumberg, The Status of Children in the Conflict of Laws*, 8 *U. Chi. L. Rev.* 42, 57 (1940).]

Thus, the changed circumstances rule has failed to promote the underlying purposes of the full faith and credit clause. In addition, it has hampered conscientious courts from addressing the basic issues in custody adjudications.

Another approach is embodied in the Uniform Child Custody Jurisdiction Act ("UCCJA"). The laudable goal of this Act is to minimize relitigation and child abduction by assuring that all child custody litigations take place "* * * in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available" and that the state's courts "* * * decline the exercise of jurisdiction when the child and his family have a closer connection with another state." UCCJA § 1(a). See also UCCJA §§ 3, 7. Courts under the Act premise their jurisdiction on expanded notions of domicile, UCCJA § 3(a)(1); conflict of laws concepts of "significant connection," UCCJA § 3(a)(2); and exigency, UCCJA § 3(a)(3). Moreover, even if a court has jurisdiction under the Act, it may decline to exercise it if it finds that the court of another state is a more convenient forum. UCCJA § 7. See also § 6 (Simultaneous Proceedings in other States). Compare *Sampsell v. Superior Court*, 32 *Cal.* 2d 763, 197 *P.* 2d 739 (Sup. Ct. 1948) and Res. 2d, Conflict of Laws § 79 (several states may have sufficient interest in child's welfare to support jurisdiction). The court may also decline jurisdiction if the petitioner had abducted or wrongfully detained the child or otherwise engaged in similar reprehensible conduct, unless the best interests of the child dictate otherwise. UCCJA § 8. Interestingly for our purposes, the Act, while granting "recognition"[2] to custody determinations rendered by states which had the requisite relationship to the subject matter, UCCJA § 13, would permit the forum state to modify a foreign decree if "* * * it

---

[2]The term "full faith and credit" is nowhere used.

appears to the court of this State that the court which rendered the decree *does not now have jurisdiction* under jurisdictional prerequisites substantially in accordance with this Act * * *." UCCJA § 14 (emphasis added).

Seventeen states have adopted the act, sixteen by legislative action and one originally by judicial incorporation.[3] The UCCJA is now pending before both houses of our Legislature. Senate Bill No. 881; Assembly Bill No. 361. Although several of the Act's provisions may provide some "guidance" for our courts in dealing with the thorny problem of child custody (see Point V *infra*), we believe that a decision as to whether or not to adopt this legislation is best left to the Legislature.

A minority of jurisdictions have held unequivocally that child custody decrees are not entitled to full faith and credit. *Rhoades v. Bohn,* 114 *So.* 2d 493 (Fla. Dist. Ct. App. 1959), aff'd, 121 *So.* 2d 777 (Fla. Sup. Ct. 1960); *Application of Burns,* 49 *Haw.* 20, 407 *P.* 2d 885 (Sup. Ct. 1965); *In re Miracle,* 208 *Kan.* 168, 490 *P.* 2d 638 (Sup. Ct. 1971); *Wear v. Wear,* 130 *Kan.* 205, 285 *P.* 606 (1930); *Obey v. Degling,* 37 *N. Y.* 2d 768, 375 *N. Y. S.* 2d 91, 337 *N. E.* 2d. 601 (Ct. App. 1975); *Bachman v. Mejias,* 1 *N. Y.* 2d 575, 154 *N. Y. S.* 2d 903, 136 *N. E.* 2d 866 (Ct. App. 1956).[4] A similar rule appears to be followed, if not ex-

---

[3]Alaska, California, Colorado, Delaware, Florida, Hawaii, Indiana, Iowa, Maryland, Michigan, Minnesota, New York, North Dakota, Oregon, Pennsylvania, Wisconsin and Wyoming have enacted the UCCJA. 9 *Uniform Laws Annotated* 99 & Supp. (1977). Minnesota originally adopted by judicial decision the procedures and criteria embodied in the UCCJA. *In re Giblin,* 304 *Minn.* 510, 232 *N. W.* 2d 214 (Minn. Sup. Ct. 1975). See 60 *Minn. L. Rev.* 820 (1976). The Act has since been enacted by the Minnesota Legislature. M. S. A. §§ 518A.01 to 518A.25.

Compare also *Dunkley v. Dunkley,* 89 *Wash.* 777, 575 *P.* 2d 1071 (1978) (although failing to adopt same, court encourages the legislature to recognize the advantages of the uniform law).

[4]The Legislatures of New York and Hawaii, however, subsequently enacted the Uniform Child Custody Jurisdiction Act, discussed above.

plicitly formulated, in several other states. See *In re Reed,* 152 *Neb.* 819, 43 *N. W.* 2d 161 (Sup. Ct. 1950); *Osborne v. Osborne,* 215 *Va.* 205, 207 *S. E.* 2d 875 (Sup. Ct. 1974) (no full faith and credit for child support decree); *Falco v. Grills,* 209 *Va.* 115, 161 *S. E.* 2d 713 (Sup. Ct. App. 1968) (Virginia follows New York rule on custody; dictum); *DeHart v. Layman,* 536 *P.* 2d 789, 791 (Alaska Sup. Ct. 1975) (modification of foreign decree permissible on showing that childs' welfare will be improved); *Wilsonoff v. Wilsonoff,* 514 *P.* 2d 1264 (Alaska Sup. Ct. 1973).

This position has also been followed by the lower courts in New Jersey. In *Casteel v. Casteel,* 45 *N. J. Super.* 338 (App. Div. 1957), the mother obtained a foreign *ex parte* divorce which incorporated a separation agreement giving child custody to the father, a New Jersey domiciliary. She later brought a custody action in New Jersey. While the action was pending, the father permitted the children to visit the mother in Nevada pursuant to the separation agreement. The mother than sought to modify the custody decree in Nevada and to obtain custody *pendente lite.* The father surreptitiously returned the children to New Jersey. He appeared by counsel at the Nevada modification hearing, which led to a custody award in favor of the mother. When the New Jersey custody action came to trial, the Chancery Division held a thorough inquiry into the relative fitness of the parties as custodians and awarded custody to the father. The Appellate Division affirmed. It assumed that the father's appearance conferred jurisdiction on the Nevada court and held:

[P]ublic policy considerations held in the highest importance in this State preclude the abdication by our courts of their statutory and *parens patriae* duty and responsibility to decide what custodial disposition is for the best interests of minor children native to and resident, as well as domiciled, in New Jersey all their lives, *entirely*

*Hawaii Stat.* § 583–1 et seq; N. Y. L. 1977 c. 493 (effective Sept. 1, 1978).

*without regard to a determination of that question by a foreign court in a litigation between their parents.* [45 *N. J. Super.* at 352; emphasis supplied]

Recently, the Appellate Division reached the same conclusion on facts strikingly similar to those in the instant case. In *Mrowczynski v. Mrowczynski,* 142 *N. J. Super.* 312 (App. Div. 1976), the parents were married in New Jersey in 1970 and moved to Florida in late 1971. After experiencing marital difficulties, the mother took the child to her mother's home in New Jersey. The father initiated divorce and custody proceedings in Florida, serving the mother with the complaint when she returned to Florida with the child in response to her husband's overtures for a reconciliation. After appearing at pretrial hearings, the mother and child returned to New Jersey as permitted under a temporary custody decree. The Florida court then permitted the paternal grandparents, who sought custody of the child, to intervene, and ordered the child to be surrendered. When the mother failed to comply, the court held her in contempt and awarded custody to the grandparents. Shortly thereafter, the grandparents sought to enforce the custody decree in New Jersey. The trial court applied the changed circumstances rule and enforced the Florida decree. The Appellate Division reversed and remanded for a plenary hearing on custody.

IV

We believe that the minority rule, followed in *Casteel, supra,* and *Mrowczynski, supra,* is constitutionally sound and is better adapted to practical resolution of custody disputes than the changed circumstances rule. Excepting child custody decrees from full faith and credit has been endorsed repeatedly by commentators. See, *e. g.,* Currie, "Full Faith and Credit, Chiefly to Judgments: A Role for Congress," 1964 *Sup. Ct. Rev.* 89, 115; *Ehrenzweig, supra,* at 373–74; Reese & Johnson, "The Scope of Full Faith and Credit to Judgments," 49 *Colum. L. Rev.* 153, 173–75 (1949) ; Stans-

bury, *supra,* at 831. Even those who favor enforcement of foreign custody decrees concede that their proposal is not constitutionally compelled. The Uniform Child Custody Jurisdiction Act, for example, requires recognition only of decrees which satisfy the Act's stringent jurisdictional requirements, see UCCJA § 13.

The existence of exceptions to the literal command of full faith and credit has long been recognized. See, *e. g., Sistare v. Sistare,* 218 *U. S.* 1, 30 *S. Ct.* 682, 54 *L. Ed.* 905 (1910) (alimony award) ; *Alaska Packers Ass'n v. Industrial Accident Comm'n,* 294 *U. S.* 532, 55 *S. Ct.* 518, 79 *L. Ed.* 1044 (1935) (workers' compensation statutes). In the latter case the Supreme Court reconciled the conflict between the potentially applicable workers' compensation statutes of Alaska and California by balancing the governmental interests of both jurisdictions. Such balancing was necessary, the Court noted, to avoid the paradoxical result of requiring each state to enforce the other's statute in preference to its own, despite its strong and legitimate interest in regulating the employment relationship. Further, the *Alaska Packers* Court stated that "there are some limitations upon the extent to which a state will be required by the full faith and credit clause to enforce *even the judgment* of another state, in contravention of its own statutes or policy." *Id.* at 546, 55 *S. Ct.* at 523, 79 *L. Ed.* at 1051 (emphasis added). Similar dicta recur in full faith and credit cases. See, *e. g., Sherrer v. Sherrer,* 334 *U. S.* 343, 355, 68 *S. Ct.* 1087, 1092, 92 *L. Ed.* 1429, 1438 (1948) ; *New York ex rel. Halvey v. Halvey, supra,* 330 *U. S.* at 615, 67 *S. Ct.* 906, 91 *L. Ed.* at 1136; *Milwaukee County v. M. E. White Co.,* 296 *U. S.* 268, 273, 56 *S. Ct.* 229, 232, 80 *L. Ed.* 220, 225–26 (1935).

The rationale for excepting some judgments from the scope of the full faith and credit clause is based on the relationship between full faith and credit and due process.

\* \* \* Between the prohibition of the due process clause, acting upon the courts of the state from which such proceedings may be taken, and the mandate of the full faith and credit clause, acting upon the

state to which they may be taken, there is an area which federal authority has not occupied. As this Court has often recognized, there are many judgments which need not be given the same force and effect abroad which they have at home, and there are some, though valid in the state where rendered, to which the full faith and credit clause gives no force elsewhere. In the assertion of rights, defined by a judgment of one state, within the territory of another there is often an inescapable conflict of interest of the two states, and there comes a point beyond which the imposition of the will of one state beyond its own borders involves a forbidden infringement of some legitimate domestic interest of the other. That point may vary with the circumstances of the case, and, in the absence of provisions more specific than the general terms of the congressional enactment, this court must determine for itself the extent to which one state may qualify or deny rights claimed under proceedings or records of other states. [*Yarborough v. Yarborough*, 290 *U. S.* 202, 214–15, 54 *S. Ct.* 181, 186, 78 *L. Ed.* 269, 277 (1933) (Stone & Cardozo, JJ., dissenting) (footnotes omitted)]

This analysis is illustrated well by the "divisible divorce" decisions of the United States Supreme Court. After *Williams v. North Carolina*, 317 *U. S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279 (1942), established that *ex parte* divorce decrees were entitled to full faith and credit, serious questions arose about the effect of *ex parte* dispositions of marital incidents such as alimony, child support, and child custody. In *Estin v. Estin*, 334 *U. S.* 541, 68 *S. Ct.* 213, 92 *L. Ed.* 1561 (1948), the United States Supreme Court unveiled the concept of "divisible divorce." The Court held that an *ex parte* Nevada divorce decree which purported to terminate the absent wife's alimony rights under a New York separation decree was entitled to full faith and credit insofar as it dissolved the marriage, but not with respect to alimony. This principle was extended in *Vanderbilt v. Vanderbilt*, 354 *U. S.* 416, 77 *S. Ct.* 1360, 1 *L. Ed.* 2d 1456 (1957), which held that denial of alimony in an *ex parte* divorce proceeding was not entitled to full faith and credit, even though the wife's rights had not been embodied in a prior judgment as in *Estin*.[5]

---

[5]Justice Frankfurter, the sole member of the *Vanderbilt* Court who rejected the concept of divisible divorce for alimony, carefully dis-

As Justice Harlan explained in his separate opinion in *Vanderbilt, supra,*[6] these decisions were simply examples of the due process — full faith and credit gap propounded by Justice Stone in *Yarborough, supra.* The rendering court acquired jurisdiction over the parties in accordance with due process requirements.[7] The subject matter of the decree, however, implicated other states' strong local interests in the marital status and welfare of their residents. With respect to marital status, the United States Supreme Court perceived a strong need for national uniformity in classifying an individual as single or married. Therefore, the dissolution of the marriage was entitled to full faith and credit. With respect to the incidents of marital status, such as alimony, however, local interests outweighed the need for

---

tinguished child custody as "an entirely different problem," 354 *U. S.* at 424 n. 1, 77 *S. Ct.* at 1365, 1 *L. Ed.* 2d at 1462 n. 1. He cited his opinion in *May v. Anderson, supra,* which asserted that full faith and credit was not owed to all custody decrees.

[6]Justice Harlan's opinion is technically a dissent because he would have remanded for determination of the wife's domicile. He agreed with the majority, however, as to the applicability of divisible divorce principles.

[7]Although the majority opinions were framed in terms of lack of jurisdiction, they did not hold that the adjudication denied due process to the absent spouse. Indeed, a due process-based holding would be difficult to reconcile with recognition of the divorce embodied in the decree. Further, if the rendering court lacked jurisdiction, its decree would be void, with no domestic effect. The Court, however, did not adopt such a drastic position. For example, in *Vanderbilt v. Vanderbilt, supra,* the Court stated:
It seems clear that in *Nevada* the effect of this decree was to put an end to the husband's duty to support the wife — provided, of course that the Nevada courts had power to do this. [354 *U. S.* at 417 n. 1, 77 *S. Ct.* at 1361, 1 *L. Ed.* 2d at 1459 n. 1; emphasis added]
The proviso clearly leaves the jurisdictional question open. Thus, the basis of the holdings in *Vanderbilt* and the related divisible divorce cases must be the full faith and credit, not the due process, clause.

uniform treatment of the decree. Consequently, nonrecognition would not offend the full faith and credit clause.

*May v. Anderson, supra,* established that child custody was a marital incident, like alimony, which was subject to strong local policies that could outweigh the demands of full faith and credit. In *May,* the Court was dealing with an *ex parte* custody adjudication. We believe that the same result obtains in all custody cases. The state has a strong independent interest as *parens patriae* in being able to adjudicate the custody of children within its jurisdiction. *Casteel v. Casteel, supra.* This interest extends even to temporary custody determinations of transient children in exigent circumstances. *Hachez v. Hachez,* 124 *N. J. Eq.* 442 (E. & A. 1938).

■ ■ ■ Custody judgments are inherently ephemeral decisions about continuing relationships which are subject to constantly changing conditions. In order to handle custody litigation expeditiously, a broad, flexible view of jurisdiction has developed.[8] The same factors which support a liberal view of custody jurisdiction militate against automatically giving custody decrees conclusive extraterritorial effect. Although a court may constitutionally make a custody determination in exigent circumstances, it may not have access to the resources necessary for an exhaustive inquiry. Another jurisdiction may have better access to these resources and a stronger interest in the child's long-term wel-

---

[8]Originally, jurisdiction to adjudicate custody was limited to the state of the child's domicile. *Restatement (First), Conflict of Laws* §§ 145–47. This rule proved to be ill-adapted to situations encountered frequently in custody litigation. If the child was removed from its domiciliary jurisdiction, for example, it was not clear whether any state could issue an enforceable custody decree. In *Sampsell v. Superior Court,* 32 *Cal.* 2d 763, 197 *P.* 2d 739 (Cal. Sup. Ct. 1948), Chief Justice Traynor postulated that jurisdiction to determine custody was not necessarily vested exclusively in one state at any given time. Rather, several states might have sufficient interests in the child's welfare to support the exercise of jurisdiction. This view has been widely accepted. *Restatement (Second), Conflict of Laws* § 79.

fare. Where, as in this case, the forum state is the established home of the children and their custodian, none of whom appeared before the court which rendered the custody decree,[9] enforced recognition of the foreign decree would certainly constitute a "forbidden infringement" on a "legitimate domestic interest" of the forum state.

## V

Our holding today removes any compulsion to enforce a foreign custody decree. We emphasize, however, that a court may choose to recognize a foreign decree to protect the child's interests, cf. *Hachez v. Hachez, supra.* Further, a court may decline to exercise its jurisdiction rather than adjudicate custody. Such a decision would be proper, for instance, when a New Jersey court is asked to determine custody of a child present in the state as a result of child-snatching or disobedience of a sister state's orders, barring extraordinary circumstances. Jurisdiction may also be declined when invoked to hamper custody litigation in another state, as in *Vannucchi v. Vannucchi,* 113 *N. J. Super.* 40 (App. Div. 1971). After he had made a general appearance in the mother's Illinois divorce proceeding, the father took the couple's child to New Jersey. Instead of returning the child at the end of the visit as agreed, the father sued in New Jersey for child custody and an injunction against the Illinois divorce action. After extended procedural maneuvers,[10] the Chancery Division awarded custody to the father,

---

[9] In the present case, the Florida court's decree was premised on continuing jurisdiction. Under Florida law, jurisdiction to determine child custody ancillary to a divorce proceeding, once acquired, continues indefinitely. *Rhoades v. Bohn, supra.* We assume, without deciding, that such continuing jurisdiction comports with due process. Nevertheless, the *ex parte* adjudication here is subject to many of the same practical objections as the custody decree in *May v. Anderson, supra.*

[10] Two weeks after the New Jersey action was filed, the Illinois court granted temporary custody to the mother. Three weeks later,

although the Illinois court had awarded temporary custody to the mother after a contested hearing. By the time the Appellate Division heard the case, the Illinois court had granted the mother a divorce, but had deferred a final decision on custody pending the outcome of the New Jersey appeal. The Appellate Division correctly held that the Chancery Division should have declined to exercise its jurisdiction, especially since the child was in New Jersey only temporarily. Specifically, the court argued, the *parens patriae* jurisdiction should not be used to obstruct contested custody proceedings in a sister state.

In deciding whether to adjudicate a custody action, the trial court should consider whether the child's welfare will be promoted by such adjudication. If there is an outstanding foreign custody decree, the court should inquire, with respect to the prior and current litigation, into the basis of the court's jurisdiction, the location of the homes of the child and its custodian, the child's physical presence, the appearance in the litigation of all interested parties, and the court's access to necessary information about the child and its present and potential custodians. Of course, the court should consider the age of the former decree. If there is active custody litigation, the court should make similar inquiries, in order to determine the propriety of staying or dismissing the New Jersey action. *Cf. E. v. T.*, 124 *N. J. Super.* 535 (Ch. Div. 1973) (Nevada court deferred to New Jersey custody adjudication). Once the court decides to adjudicate custody, it should, of course, make the most thorough investigation possible under the circumstances of the case.

## VI

Turning to the present case, a complete inquiry by New Jersey into custody is clearly appropriate. When the

the mother defaulted in the New Jersey action, and the Chancery Division granted custody to the father and enjoined the mother from proceeding with the Illinois divorce. The Appellate Division reversed and remanded to permit the mother to appear in the Chancery Division. A contested trial followed.

Florida custody decree was entered, Mrs. Borys and her children had been living in New Jersey for almost three years. The disruptive potential of a decision to remove the children from their mother's care and transplant them to their grandparents' home in Florida, with no provision for maternal visitation rights, is patent. Yet the Florida court rendered its decree in the absence of the children and their mother and with only minimal information about their present home environment. Further, the Florida proceedings were supported solely by continuing jurisdiction ancillary to the parents' divorce three years earlier. In light of all the circumstances, unquestioning enforcement of the Florida decree would be inconsistent with the interest of New Jersey as *parens patriae* in the children's welfare. Mechanical invocation of the full faith and credit clause in this case would serve no one's best interest, and is not mandated by the policies or precedent associated with the clause.

The judgment of the Appellate Division is affirmed. The case will be remanded for a plenary hearing.

*For affirmance and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.