171 N.J. Super. 12 (1979)
407 A.2d 1242
DIANE VAN HAREN (NOW HENDRICKSON), PLAINTIFF-RESPONDENT,
v.
JAMES VAN HAREN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted September 25, 1979.
Decided October 19, 1979.
*13 Before Judges MATTHEWS, ARD and POLOW.
Mr. Alfred T. Sanderson, attorney for appellant.
Mr. John J. Lindsay, attorney for respondent (Messrs. Boakes, Lindsay and Smith, attorneys).
The opinion of the court was delivered by POLOW, J.A.D.
This is an interstate custody dispute involving conflicting New Jersey and South Carolina rulings, both of which were violated by the surreptitious removal of the children from one state to the other. Both parents have been adjudicated in contempt for deliberate violations of custody orders, the mother in South Carolina and the father in New Jersey.
On May 7, 1978 the Superior Court of New Jersey, Chancery Division, Gloucester County, granted custody to the mother, in conflict with a July 30, 1975 order of the Richland County, South Carolina Family Court awarding custody to the father. In appealing the New Jersey determination, the father urges that his former wife participated in the South Carolina custody action and its decree is entitled to comity in this state as a matter of law.
A summary of the procedural developments leading up to this appeal is necessary to an understanding of the issues.
Diane and James Van Haren were married in Maryland on June 20, 1970. Shortly thereafter they moved to New Jersey where both children were born, James Jr. on December 16, 1970 and Paul on March 28, 1972. The marriage was stormy. On February 12, 1974, following a domestic dispute, the husband took the children from the marital home in Gloucester County to the nearby residence of his parents. After her repeated unsuccessful efforts to get the children, plaintiff wife sought custody and support in the Gloucester County Juvenile and Domestic Relations Court. Defendant also demanded custody in that action.
*14 That dispute was heard on March 8, 1974, with both parties present and represented by counsel. Temporary custody was awarded to the wife in an oral opinion which mentioned that "children of tender years ... are customarily placed in custody of their mother...." Provisions were made for visitation and support and the Division of Youth and Family Services was ordered to conduct an investigation to determine whether there had been evidence of child neglect.
Shortly after the entry of that custody order defendant husband took the young children and left the jurisdiction[1] thereby precipitating issuance of a warrant for his arrest. Plaintiff's efforts to locate her husband and the children were unsuccessful until August 1974, when they were discovered in South Carolina. But, before she could effect service of a writ of habeas corpus upon defendant, they disappeared again.
Plaintiff instituted divorce proceedings in New Jersey on August 13, 1974 demanding permanent custody of her children. (The prior Domestic Relations order had been for "temporary" custody.) On January 15, 1975 the Chancery Division ordered substituted service upon defendant. After defendant's default had been entered, a final hearing took place on June 4, 1975. Although the court was advised of the absence of defendant and the children from this State, the judge ruled that there was in personam jurisdiction over defendant based upon the prior temporary custody order and the continuing jurisdiction of the Juvenile and Domestic Relations Court for enforcement of that order. A judgment was entered dissolving the marriage between the parties and awarding child custody to the wife.
*15 On May 9, 1975, while the Chancery Division action was pending but before the divorce judgment had been entered, defendant instituted a petition for divorce and custody in the Family Court of South Carolina. After plaintiff was personally served on June 9, 1975, she filed a timely answer and made an appearance through local counsel. Her attorney advised the South Carolina court of the final divorce judgment in New Jersey and the divorce demand was therefore stricken. However, the South Carolina court proceeded with custody hearings on June 24 and 25, 1975.
A social investigation was ordered concerning defendant, his living arrangements and his care and treatment of the children. No apparent effort was made to obtain an investigation regarding plaintiff in New Jersey. The report in South Carolina was generally favorable to defendant. The court there found that the children were well cared for physically and emotionally and concluded that their "best interests" would be served by allowing them to remain with their father. Reasonable visitation rights were provided for the mother but the court order mandated that she not remove the children from South Carolina. Nevertheless, under the guise of exercising her visitation rights, plaintiff took the children on August 23, 1975 and returned with them to New Jersey, whereupon an order for her arrest was issued in South Carolina.
Upon their return to New Jersey plaintiff kept the children's whereabouts from defendant. On an ex parte application of the paternal grandparents, dated August 25, 1975, the Chancery Division in Gloucester County declared the children wards of the State and ordered appropriate law enforcement agencies to attempt to locate them. The record fails to disclose what action was taken pursuant thereto. However, it is clear that plaintiff had remarried soon after the divorce judgment and her children were living in her new home as of August 1975.
*16 Shortly thereafter defendant returned to New Jersey and sought to enforce the South Carolina custody decree. In November 1975 he appeared before the Gloucester County Juvenile and Domestic Relations Court to purge himself of contempt. He was found guilty, sentenced and fined. The sentence was suspended.
On May 17, 1976 defendant brought a motion in the Chancery Division to vacate the custody portion of the divorce judgment, demanding that full faith and credit be given to the South Carolina custody decree. The Chancery Division judge defined his primary concern as whether "the South Carolina judgment is constitutionally required to be enforced and what would be in the best interests of the children at the present time, if it is not." Defendant was permitted to file an appearance out of time on the questions of custody, visitation and child support. Pursuant to R. 4:79-8(a), the probation department was directed to conduct a full and complete investigation of the homes of both parents as well as that of the paternal grandparents. Although no change in custody was ordered, on July 7, 1976 defendant was granted reasonable visitation rights in plaintiff's home and an order so providing was entered August 6, 1976. Several motions were subsequently heard but no determination was made on defendant's May 17, 1976 motion until May 13, 1977, when a plenary hearing was ordered.
On August 16, 1977 a hearing on custody took place and two weeks later the court, relying on Mrowczynski v. Mrowczynski, 142 N.J. Super. 312 (App.Div. 1976), and Vannucchi v. Vannucchi, 113 N.J. Super. 40 (App.Div. 1971), denied full faith and credit to the South Carolina decree. A full hearing on the best interests of the children was scheduled and a probation investigation ordered.
The final custody hearing resulted in an order entered on May 23, 1978 granting permanent custody to plaintiff. The trial judge concluded that the best interests of the children required them to be placed with their mother where they had been continuously for two years and nine months as of that time. *17 The judge declined to make any determination as to whether the previous permanent custody award in this State had been valid. Defendant insisted then, as he does now, that he was entitled to have a ruling that the previous New Jersey award was without force since there had been no in personam jurisdiction over him in the original Chancery Division suit. But the judge ruled that the efficacy of the prior Chancery Division jurisdiction ruling was immaterial and that even assuming the jurisdictional validity of the South Carolina custody determination it is not automatically entitled to full faith and credit nor to comity under the circumstances.
On this appeal defendant again urges his right to challenge the June 1975 Chancery Division custody order. Further, he argues that even though Borys v. Borys, 76 N.J. 103 (1978), disposes of his original demand for full faith and credit for the South Carolina decree, comity considerations mandate recognition and enforcement of that decree. Finally, he insists that plaintiff should be barred from any relief coming into the court, as she does, with unclean hands.
In Borys our Supreme Court determined that the power to modify a foreign custody decree is not inconsistent with the Full Faith and Credit Clause of the United States Constitution. Id. at 111, citing New York ex rel. Halvey v. Halvey, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947). Our problem here is to interpret recent case authority and legislative policy declarations and apply them to the circumstances of this case.
It has become increasingly apparent that where both parents are capable of rearing a child, the right decision in a custody dispute is an elusive concept. See Dembitz, "Beyond Any Discipline's Competence," 83 Yale L.J. 1304 (1974); Goldstein, Freud and Solnit, Beyond the Best Interests of the Child, 49-52, 63 (1973). Rather, there is a growing recognition of a child's primary need for a stable home which, together with continuity of environment and personal attachments, outweighs the traditional concept of modifiability and fluidity of custody decisions *18 to satisfy changing conditions. See Bodenheimer, "Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody and Excessive Modification," 65 Cal.L.Rev. 978 (1977).
The difficulty in adjudicating custody is increased to an almost intolerable level by the all too common practice of "child snatching." According to two prominent authors in this field, "... our law as to child custody remains barbaric ..." Foster and Freed, "Child Snatching and Custodial Fights: The Case for the Uniform Child Custody Jurisdiction Act," 28 Hastings L.J. 1011 (1977). Perhaps it is more accurate to characterize as barbaric the behavior of parents who fight their personal emotional battles using the children as weapons, with little concern about the detrimental effect of their warfare on the children. Professor Foster and Dr. Freed see the Uniform Child Custody Jurisdiction Act (UCCJA) as providing a sophisticated and civilized process for handling custody cases. Id. at 1025.
New Jersey has adopted the UCCJA, effective July 1, 1979. N.J.S.A. 2A:34-28 et seq. Although it was not part of our statutory scheme when the present case was decided at the trial level, it does represent our public policy now. Hence, a consideration of relevant portions of the act with regard to the problem before us is appropriate.
The goal of the sponsors of this act is to minimize relitigation of custody awards and child abduction. This is sought to be accomplished by attempting to assure that all child custody litigation occurs in the jurisdiction with which the child and family have the closest ties. Ibid. The state courts are instructed to decline jurisdiction if there are closer ties to another state.
In applying the foregoing considerations to the matter at hand, we note the following factors:
1. The children lived in this State with both parents from the time of their births in December 1970 and March 1972 until removed from the State by their father in or about March 1974;
*19 2. The children lived with their father in South Carolina from sometime in mid-1974 until removed back to New Jersey by their mother in August 1975;
3. They have lived with their mother in New Jersey since August 1975.
From the foregoing it is obvious that at the time of the custody hearing in May 1978 the older son had lived more than 6 of his 7 1/2 years in New Jersey, and the younger son had spent almost 5 of his 6 years in this State. In the language of the statute, we conclude that the children and their family had their "closest connection" with the State of New Jersey.
Another legislative purpose is the avoidance of jurisdictional conflict and competition with other states to prevent shifting of children from state to state, with consequent harmful effects on their well-being. This desirable goal has been frustrated in the case before us and would be totally defeated if another round of litigation or another transfer of the children from one family in this State to another family in another state were permitted.
The Juvenile and Domestic Relations Court of this State had entered the first custody order in favor of plaintiff while the entire family was living in this jurisdiction. New Jersey was unquestionably the family domicile. The Family Court of South Carolina entered a conflicting custody order despite the fact that the father had removed the children from New Jersey in violation of that preexisting New Jersey order.
Under all of these circumstances, does plaintiff's removal of the children from South Carolina in violation of that court's order, in itself, mandate refusal to exercise jurisdiction here? Defendant vigorously proclaims that the wrongful conduct of his former wife in violating the South Carolina order is so reprehensible as to bar her from any right to relief. The UCCJA stated policy is to decline to exercise jurisdiction if the petitioner has abducted the child. However, defendant's otherwise valid *20 premise is fatally marred by his own prior misconduct in abducting the children, in direct violation of the order of a court of this State.[2] He also comes before the court with unclean hands. His prior misconduct in fact set in motion the chain of events which led to the removal of the children out of New Jersey and their removal back into this State, all within a 17-month period. If both parties have unclean hands, then surely the primary concern must now be what is best for the children.
Although the UCCJA grants "recognition" to foreign custody determinations under appropriate circumstances, it nonetheless permits modification in the forum state where the foreign court lacked jurisdictional prerequisites. South Carolina lacked UCCJA jurisdictional prerequisites in that the father who brought the petition there had wrongfully taken the children from New Jersey, in direct violation of the order of a court of this State.
Having considered the primary goals enunciated by the Legislature in enacting the UCCJA, we are satisfied that, although the act was not controlling at the time of the determination below, the principles of law then applicable in this situation did not differ appreciably from the policies mandated by the act.
Our courts did not hesitate to recognize those situations which require declination of jurisdiction in deference to a state in which the children and family had more direct contacts. Vannucchi v. Vannucchi, 113 N.J. Super. 40 (App.Div. 1971); Hachez v. Hachez, 124 N.J. Eq. 442 (E. & A. 1938); see also, Nehra v. *21 Uhlar, 43 N.Y.2d 242, 401 N.Y.S.2d 168, 372 N.E.2d 4 (1977), where the New York Court of Appeals noted that the court in New Jersey had suspended proceedings and deferred to what the New York courts might hold even though the children had moved to New Jersey with their mother.
A situation much like the one before us now was confronted in Casteel v. Casteel, 45 N.J. Super. 338 (App.Div. 1957). The mother had obtained a foreign divorce which incorporated an agreement to give custody to the father living in this State. While the children were visiting the mother in Nevada pursuant to the agreement she sought a modification of the custody agreement in that state. Although the father appeared there by counsel, Nevada awarded custody to the mother. However, the father surreptitiously removed the children back to New Jersey. When the New Jersey custody action came to trial, the court ordered a thorough investigation into the fitness of the parties and awarded custody to the father. In affirming, the Appellate Division stressed the fact that the children had been natives of this State and domiciled here all their lives. We believe that the sound policy enunciated there is no less applicable here even though these children were in South Carolina with their father for about 17 months after he had surreptitiously removed them from New Jersey.
More recently, a similar situation also resulted in an Appellate Division determination that a plenary hearing on custody was appropriate despite a foreign custody decree. In Mrowczynski v. Mrowczynski, 142 N.J. Super. 312 (App.Div. 1976), the parties had marital problems while living in Florida. The mother took the child to her parents' home in New Jersey but returned to Florida with the child in response to her husband's conciliatory overtures. He immediately had her served with a divorce and custody complaint and, contrary to court order, she returned to this State with the child. Custody was awarded to the grandparents by the Florida court and the trial court here enforced that decision. The Appellate Division reversed and held that *22 under the circumstances a determination of custody in New Jersey would be in the best interests of the child and would "not offend principles of comity and judicial statesmanship." 142 N.J. Super. at 322.
We find here that there is a special equity justifying the decision of the trial court to intervene in the best interests of the children. See Stultz v. Stultz, 15 N.J. 315, 319 (1954). This special equity arises from the original residence and domicile of the children and the family in this State, the years of their residence here, the manner and circumstances of their original removal, the priority of the custody proceeding of a court of this State and our ultimate concern to achieve a result best suited to protect the children against further shifting from state to state and the consequent instability in home environment and insecurity of family relationships for the children.
We are satisfied that this decision fully comports with the public policy expressed by the Legislature in enacting the UCCJA as well as the judicial authority most recently articulated by our Supreme Court in Borys, supra, removing automatic or compulsory enforcement of a foreign custody decree under the circumstances therein described. We are satisfied that similar circumstances existed here justifying the plenary hearing in the trial court.
Having so determined, we have reviewed the proceedings conducted by Judge Talbott leading to the most recent custody ruling under attack. She had current probation reports, psychiatric evaluations, the testimony of the mother and her interview with the children. Although defendant was represented by counsel, he declined to participate when the judge refused to determine the validity of the 1975 Chancery Division custody award. There is no doubt that he had every opportunity to participate and was represented by counsel during all of the recent hearings.
The children are comfortable and happy where they are. They desire to remain with plaintiff and have some concern *23 about the possibility of being taken away again. Although not controlling, the desires of the children should be given consideration. Palermo v. Palermo, 164 N.J. Super. 492, 499 (App.Div. 1978).
Judge Talbott's determination is adequately supported by the record. It comports with the best interests of the children. Any further application with respect to visitation should be made to the trial court with a view to accomodating the interest of the children in developing and maintaining a loving and caring relationship with their father by way of appropriate visitation privileges. This must be done in a manner fashioned so as to assure against any further surreptitious behavior by either party.
Affirmed.
NOTES
[1] Much of defendant's argument in the trial court as well as a substantial portion of his brief on appeal was devoted to a jurisdictional attack on a June 1975 New Jersey Chancery Division judgment awarding custody to the mother. However, the order referred to herein as having been violated by defendant when he surreptitiously removed the children from this State was that of the Juvenile and Domestic Relations Court issued on March 8, 1974.
[2] We are not unmindful of defendant's argument that the Juvenile and Domestic Relations Court erred in applying the "tender years" doctrine, DiBiano v. DiBiano, 105 N.J. Super. 415, 418, 252 A.2d 735 (App.Div. 1969), and determining custody without a social investigation. R. 4:79-8(a). Regardless of the merits of those arguments, if any, defendant lacked the right to violate the court's order. Salmon v. Salmon, 88 N.J. Super. 291, 314, 212 A.2d 171 (App.Div. 1965). He used self-help, one of the evils which the UCCJA seeks to eliminate.